YVONNE ANTONACCI, Indiv. and as Special Adm'r of the Estate of James Antonacci, Deceased, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (3rd Division)   No. 1—01—3317

Opinion filed November 6, 2002.

Howard Schaffner, of Hofeld & Schaffner, of Chicago, for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Myriam Zreczny, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

We inquire into the extent of statutory immunity given the City of Chicago (the City) where its paramedics allegedly failed to perform an EKG or defibrillation on a patient they had diagnosed as having had a heart attack.

The trial court decided in favor of immunity and granted the City's motion to dismiss the complaint. We conclude the trial court's decision was premature. We vacate the order dismissing the lawsuit and remand this cause for further proceedings.

FACTS

Plaintiff, Yvonne Antonacci, individually and as special administrator of the estate of James Antonacci, deceased, sued defendant, City of Chicago, alleging that 911 personnel willfully and wantonly mistreated plaintiff's decedent's heart attack, resulting in his death. Defendant filed a section 2—619 motion to dismiss (735 ILCS 5/2—619 (West 2000)) in lieu of an answer, based on the immunity provisions of sections 6—105 and 6—106(a) of the Local Governmental and Governmental Employees Tort Immunity Act (the Tort Immunity Act) (745 ILCS 10/6—105, 6—106(a) (West 2000)).

Plaintiff filed a second amended complaint on May 3, 2001. She later attached a physician's report, pursuant to section 2—622(a)(1) of the Code of Civil Procedure. 735 ILCS 5/2—622(a)(1) (West 2000). No depositions were taken in this case. Defendant concedes in its brief on appeal the allegations in the physician's report are a part of the plaintiff's complaint. We look to the second amended complaint and the physician's report attached to it for the facts of this case.

The complaint alleged on October 5, 2000, plaintiff's decedent suffered a heart attack[1] at his home in Chicago. Plaintiff called 911 and requested an emergency vehicle be dispatched to the home. After two telephone calls to the 911 system, an emergency vehicle with 911 personnel arrived at the home. On arrival, the 911 personnel "began treating plaintiff's decedent," at which time he had a pulse and a heartbeat. Knowing that plaintiff's decedent required defibrillation[2] to regulate his heartbeat and failure to defibrillate was likely to result in death or great bodily injury, the paramedics "intentionally and knowingly refused to defibrillate plaintiff's decedent."

The complaint also alleged the 911 personnel refused to run an EKG[3] strip on plaintiff's decedent, knowing such a strip was necessary to determine his cardiac rhythm. The 911 personnel knew failure to

---

[1]A "heart attack," also known as a "myocardial infarction," is defined in part as "[t]he loss of living heart muscle as a result of coronary artery occlusion" (Taber's Cyclopedic Medical Dictionary (19th ed. 2001)), or "an acute episode of heart disease (as myocardial infarction) due to insufficient blood supply to the heart muscle itself esp. when caused by a coronary thrombosis or a coronary occlusion" (Merriam-Webster's Medical Desk Dictionary (2001)).

[2]"Defibrillation" is defined as "[t]ermination of ventricular fibrillation (vfib) with electrical countershock(s). This is the single most important intervention a rescuer can take in patients who have suffered cardiac arrest due to vfib or pulseless ventricular tachycardia." Taber's Cyclopedic Medical Dictionary (19th ed. 2001).

[3]An "EKG" or "electrocardiogram" is defined as "[a] record of the electrical activity of the heart, consisting of waves called P, Q, R, S, T, and sometimes

make this determination would make it impossible to properly determine the course of treatment, creating a strong risk of death or great bodily harm.

Count I of the complaint alleged that as a direct and proximate result of the defendant's willful and wanton acts and/or omissions, plaintiff's decedent sustained injuries resulting in his death on October 5, 2000. Count II alleged that as a result of defendant's actions and/or omissions, plaintiff's decedent suffered injuries that caused him conscious pain and suffering and disability and disfigurement before his death on October 5, 2000.

In the physician's report attached to the complaint, the physician states his opinion, based on a review of medical records, that plaintiff's decedent suffered a myocardial infarction. The 911 paramedics who responded correctly diagnosed that he had suffered a heart attack and began treating him for that condition. The standard of practice for treatment of a heart attack would be electronic defibrillation unless the performance of an EKG confirmed the patient was in asystole.[4] The EKG is the only way the paramedics could have determined if the heart attack suffered by the patient would be refractory[5] to defibrillation because of the presence of asystole.

While the paramedic records contain a statement that an EKG was performed and the patient was in asystole, there are no strips or evidence in the record to confirm an EKG actually was performed. Witnesses present at the scene say no EKG was performed. In the physician's opinion, the paramedics deviated from accepted standards of medical practice in failing to perform an EKG and in failing to defibrillate the patient. The physician's report concludes by stating if the patient had been treated in compliance with accepted standards of medical care, he would have survived the heart attack he suffered.

In response to the complaint, defendant filed a section 2—619 motion to dismiss. 735 ILCS 5/2—619 (West 2000). In the motion,

---

U. *** The electrocardiogram gives important information concerning the spread of electricity to the different parts of the heart and is used to diagnose rhythm and conduction disturbances, myocardial infarction or ischemia, chamber enlargement and metabolic disorders, among others." Taber's Cyclopedic Medical Dictionary 672 (19th ed. 2001).

[4]"Asystole" is defined as "cardiac standstill; absence of electrical activity and contractions of the heart evidenced on the surface electrocardiogram as a flat (isoelectric) line during cardiac arrest." Taber's Cyclopedic Medical Dictionary 189 (19th ed. 2001).

[5]"Refractory" is defined as "[r]esistant to ordinary treatment," or "[r]esistant to stimulation; used of muscle or nerve." Taber's Cyclopedic Medical Dictionary 1849 (19th ed. 2001).

defendant contended plaintiff's claims were barred by sections 6—105 and 6—106(a) of the Tort Immunity Act.[6] 745 ILCS 10/6—105, 6—106(a) (West 2000).

■ Section 6—105 states:

"Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILCS 10/6—105 (West 2000).

■ Section 6—106 states:

"(a) Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.

(b) Neither a local public entity nor a public employee acting within the scope of his employment is liable for administering with due care the treatment prescribed for mental or physical illness or addiction.

(c) Nothing in this section exonerates a public employee who has undertaken to prescribe for mental or physical illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury.

(d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILCS 10/6—106 (West 2000).

The trial court entered a memorandum opinion and order granting defendant's section 2—619 motion to dismiss. In its opinion, the court found the allegations with regard to the failure to perform an EKG were, essentially, a failure to perform an adequate physical examination test, immunized by section 6—105 of the Tort Immunity Act. Further, failure to perform an EKG is immunized by section 6—106 because plaintiff alleged the EKG was required in order to

---

[6]Defendant's motion also faulted plaintiff for not including an attorney's affidavit or physician's report under section 2—622, an omission plaintiff later cured. 735 ILCS 5/2—622 (West 2000).

diagnose the decedent's condition of asystole. Section 6—106 also immunizes failure to defibrillate, according to the opinion, because it provides immunity from liability for the failure to prescribe treatment for a medical condition.

DECISION

We are dealing with a statute that rewards medical indolence and miscalculation resulting in harm to a patient. That is, if governmental medical personnel do not examine the patient, they are immunized. 745 ILCS 10/6—105 (West 2000). If they fail to make a diagnosis or fail to prescribe treatment or if they make an incorrect diagnosis, they are immunized. 745 ILCS 10/6—106(a) (West 2000). But negligent or wrongful prescribing of treatment that results in harm is not immunized. 745 ILCS 10/6—106(c) (West 2000). Nor is there immunity for harm caused by a negligent or wrongful act or omission in administering the prescribed treatment after a correct diagnosis. 745 ILCS 10/6—106(d) (West 2000).

Our task is to determine where in the statutory scheme the plaintiff's allegations fit.

■ All we have before us are the plaintiff's complaint and the physician's report. The City's section 2—619 motion to dismiss admits the complaint is legally sufficient, but asserts an affirmative defense that defeats the claim. See *Cosman v. Ford Motor Co.*, 285 Ill. App. 3d 250, 254, 674 N.E.2d 61 (1996). The trial court's dismissal presents a question of law, so we will conduct a *de novo* review. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116, 619 N.E.2d 732 (1993). We are required to accept as true all well-pleaded facts in the plaintiff's complaint. *Board of Managers of the Village Center Condominium Ass'n v. Wilmette Partners*, 198 Ill. 2d 132, 134, 760 N.E.2d 976 (2001).

■ When we determine whether the Tort Immunity Act applies, we bear in mind certain basic principles. The Tort Immunity Act governs whether and in what situations local governmental units are immune from civil liability. *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 375, 687 N.E.2d 1042 (1997). The Act is in derogation of the common law and we must strictly construe it against the City. *Snyder v. Curran Township*, 167 Ill. 2d 466, 477, 657 N.E.2d 988 (1995).

The City would be liable in tort for the same reasons private tortfeasors would be liable, unless the Tort Immunity Act or some other statute imposes conditions on that liability. See *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 345, 692 N.E.2d 1177 (1998).

■ Our primary goal in this case is to ascertain and give effect to the intention of the legislature. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 388, 665 N.E.2d 808 (1996). We cannot depart from the plain language of the Tort Immunity Act by reading into it exceptions, limitations, or conditions that conflict with express legislative intent. *Barnett*, 171 Ill. 2d at 389. Our duty is to apply the statute as written and as our precedent dictates. Easily said, but not so easy in the application where the conduct of paramedics in a patient's home under emergency conditions is at issue.

Plaintiff's complaint and physician's report allege the paramedics correctly diagnosed the decedent with a "heart attack" and began to "treat" him. That is, contends the plaintiff, once there was a correct diagnosis, the omissions that followed—no EKG test, no defibrillation—were not immunized by the Tort Immunity Act, even though the EKG was a required test to determine whether the patient was in asystole, thus making defibrillation useless. Plaintiff relies on section 6—106(d).

The City's position is that "heart attack" is too vague and general a diagnosis to trigger liability. That is, contends the City, the paramedics could not begin to treat the patient until they learned whether he was in asystole. That would be done by conducting an EKG test. An EKG is a diagnostic tool, not a method of treatment. Defibrillation might or might not then be required. It follows, then, says the City, no "treatment" was prescribed or begun. That means plaintiff's claim, at most, amounts to a failure to diagnose or failure to prescribe, fully immunized under section 6—106(a), or a failure to conduct an examination, immunized by section 6—105 no matter when it occurs.

Both sides claim support in the reported decisions.

Plaintiff relies almost entirely on our decision in *American National Bank & Trust Co. of Chicago v. County of Cook*, 327 Ill. App. 3d 212, 762 N.E.2d 654 (2001). There, the mother's doctor determined her unborn child was in a transverse lie, a position that could result in asphyxia to the child. Over the next several weeks, the mother saw another doctor employed by the defendant. The complaint alleged the second doctor was negligent in failing to perform an ultrasound or stress test to learn whether the baby's position had changed, failing to perform external manipulation to change the baby's position, and in attempting natural delivery, which resulted in brain damage to the child.

The trial court held the Tort Immunity Act applied and granted summary judgment for the county, but we reversed and remanded. We held:

"Once diagnosis of a medical condition is made and treatment of

the condition is prescribed and undertaken, any subsequent prescription or examination required to be made pursuant to that condition is part of the patient's treatment." *American National Bank*, 327 Ill. App. 3d at 220.

We applied the same provision plaintiff relies on in this case, section 6—106(d). The correct diagnosis had been made at the hospital; there could be no immunity for actions that take place or are omitted in the course of administering the prescribed treatment based on that correct diagnosis. That absence of immunity applies to an incorrect subsequent prescription or examination or to a prescription, examination, or treatment that did not take place at all. In short, once the correct diagnosis is made and treatment for it is prescribed, all immunity bets are off.

*American National Bank* is the reason why the plaintiff in this case emphasizes her claim that the paramedics correctly diagnosed decedent's heart attack. There and here, contends the plaintiff, the correct diagnosis had been made and neither the required treatment nor the required testing was done. Therefore, no immunity.

The City contends the correct approach to "diagnosis" and "treatment" is contained in *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 732 N.E.2d 528 (2000). There, plaintiff's decedent visited Cook County Hospital several times from September 1986 to February 1987 concerning lumps and pain in her breast. In October 1986, she was diagnosed with fibrocystic breast disease and advised to return for follow-up appointments. In July 1988, she was diagnosed with breast cancer and died of it in November 1989.

The complaint against the county and its doctors alleged they were negligent for failing to order a mammogram, failing to adequately perform examinations, and failing to administer proper medical care. *Michigan Avenue National Bank*, 191 Ill. 2d at 499-500.

The trial court granted summary judgment based on the Tort Immunity Act. The appellate court affirmed. See *Michigan Avenue National Bank v. County of Cook*, 306 Ill. App. 3d 392, 714 N.E.2d 1010 (1999). The supreme court affirmed the appellate court.

The court found the terms "diagnosis" and "treatment" as used in section 6—106 must be given their plain and ordinary meaning, to be found in dictionaries. "Diagnosis," among other things, is "the 'art or act of identifying a disease from its signs and symptoms,' and as an 'investigation or analysis of the cause or nature of a condition, situation, or problem.' [Citation.]" *Michigan Avenue National Bank*, 191 Ill. 2d at 510. "Treatment," among other things, is " 'the action or manner of treating a patient medically or surgically,' " (*Michigan Avenue Naitonal Bank*, 191 Ill. 2d at 510, quoting Webster's Third

New International Dictionary 2435 (1993)) and " '[t]he management and care of a patient for the purpose of combating disease or disorder' " (*Michigan Avenue National Bank*, 191 Ill. 2d at 511-12, quoting Sloan-Dorland Annotated Medical Legal Dictionary 746 (1987)).

Thus armed, the court held:

"Because the gravamen of plaintiff's action against defendants is that defendants' failure either to perform examinations or to adequately perform examinations led to defendant's failure to diagnose Collins' breast cancer, which, in turn, proximately caused her death, the immunity provided to local public employees in section 6—105 and subsection (a) of section 6—106 applies." *Michigan Avenue National Bank*, 191 Ill. 2d at 512.

■ How, then, do we reconcile *Michigan Avenue National Bank* with *American National Bank*? The ascendant facts that separate the two decisions are whether a correct diagnosis had been made and treatment prescribed. Negligent or wrongful prescribing of treatment is not immunized. See 745 ILCS 10/6—106(c) (West 2000). The failure to prescribe treatment is. 745 ILCS 10/6—106(a) (West 2000).

In *Michigan Avenue National Bank*, there never was a correct diagnosis. In *American National Bank* there was, and treatment had been correctly prescribed.

Our analysis finds support in other appellate court decisions.

In *Mabry v. County of Cook*, 315 Ill. App. 3d 42, 733 N.E.2d 737 (2000), the plaintiff's decedent received a diagnosis of asthma and was treated for that condition. She later died of an undiagnosed pulmonary embolism. The plaintiff contended this was negligent prescription of treatment, not immunized. But the court held the alleged negligence was not based on treatment actually received for asthma, but on the treatment plaintiff should have received and the diagnosis of pulmonary embolism the doctors should have made. The county was immune for failing to treat a condition it had failed to diagnose. *Mabry*, 315 Ill. App. 3d at 57.

In *Carr v. Cook County Hospital*, 323 Ill. App. 3d 184, 751 N.E.2d 119 (2001), the plaintiff alleged the hospital and its doctors negligently failed to diagnose and treat a child's ruptured tendon. Testimony at trial revealed the defendants never diagnosed or treated the ruptured tendon but instead thought they were dealing with a skin laceration and treated that condition. The trial court granted the defendants a directed verdict, based on the Tort Immunity Act. We affirmed, holding the evidence related to a failure to properly examine or diagnose the plaintiff's condition, conduct immunized by sections 6—105 and 6—106(a) of the Act.

Finally, in *Lloyd v. County of Du Page*, 303 Ill. App. 3d 544, 551-52, 707 N.E.2d 1252 (1999), the court held the county's convalescent center was not immune where plaintiff's complaint alleged the center's nursing care employees negligently administered treatment diagnosed and prescribed by the decedent's doctors.

■ Where are we, then? None of the decisions we refer to dealt with paramedic conduct or lack of it. There may or may not have been a "diagnosis" and prescribed "treatment" that would exclude tort immunity. We do know the decedent in this case had a heartbeat and pulse when the paramedics arrived, but we know little else about what happened next and what that means. We do not have the benefit of the kind of facts developed during trial court proceedings in *Michigan Avenue National Bank, American National Bank*, and the other cases we have cited.

We conclude principled resolution of the immunity issue requires a better record. There are enough factual allegations in the plaintiff's complaint and the physician's report for us to say the motion to dismiss should not have been granted. But we do not want to be understood as saying more than we are. This is a serious issue and should be dealt with seriously in further proceedings.

We do not rule on the merits of the City's motion, thus leaving open for the City the pursuit of its immunity claim. See 735 ILCS 5/2—619(d), (e) (West 2000). We assume there will be more evidence of when and how diagnosis, prescription of treatment, and/or treatment were performed or not performed. Among the questions to be addressed is whether, in the circumstances of this case, the EKG actually was performed, and, if not, would it have been part of the prescribed treatment for a correctly diagnosed heart attack, or would it have been part of the examination to determine the correct treatment of an undiagnosed condition? The answer could determine the existence of at least some tort immunity for the City.

## CONCLUSION

For the reasons we have set out, the trial court's order granting the City's motion to dismiss is vacated, and this cause is remanded to the trial court for further proceedings.

Vacated and remanded.

SOUTH, P.J., and HALL, J., concur.