SIXTH DIVISION
June 22, 2007

No. 1-06-2116

| | | |
|---|---|---|
| JO ANN ABRUZZO, Independent Administrator of the Estate of Joseph Furio, Deceased, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County, Illinois. |
| v. | ) ) | No. 05 L 11789 |
| THE CITY OF PARK RIDGE, a Municipal Corporation, | ) ) ) | Honorable Kathy M. Flanagan |
| Defendant-Appellee. | ) ) ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff, Jo Ann Abruzzo, brought suit against defendant, the City of Park Ridge, alleging that the city's emergency medical technicians (EMTs) failed to provided emergency medical care to her minor son, Joseph Furio, and that, as a result, Joseph later died. Park Ridge brought a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2004)), asserting that the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1 *et seq.* (West 2004)) (Tort Immunity Act) provided an affirmative defense to plaintiff's claims. The circuit court granted defendant's motion, and plaintiff brought this appeal. For the reasons that follow, we affirm.

## I. BACKGROUND

Abruzzo filed an original complaint as the independent administrator of Joseph's estate on October 28, 2005, seeking damages for wrongful death, survival, and family expenses. The complaint alleged the following. On October 31, 2004, Joseph was 15 years old and living with

his father, Lawrence Furio, in Park Ridge, Illinois. At 1:06 a.m., Lawrence called 911 requesting emergency medical assistance for Joseph, who was "nonresponsive" and who "required CPR." A Park Ridge fire truck and an ambulance, manned by EMTs, paramedics, and firefighters, were dispatched shortly thereafter. Upon their arrival, the EMTs, paramedics and firefighters did not "evaluate or assess" Joseph, and they did not provide "advanced life support" to Joseph. The EMTs and paramedics "were informed or should have learned" that Joseph had a history of drug abuse.

The complaint further alleged:

"Park Ridge, by and through its duly authorized agents and employees, behaved with willful and wanton conduct in a manner which was in utter indifference and conscious disregard for the health and safety of decedent, Joseph Furio, in one or more of the following respects:

(a) responded to a request for emergency medical service for an unresponsive patient receiving CPR with a history of drug abuse and never evaluated or assessed the patient;

(b) in disregard of the basic precepts of training for EMTs and paramedics and in violation of standard orders of procedure and accepted emergency protocols, failed to evaluate or assess Joseph Furio;

(c) in disregard of the basic precepts of training for EMTs and paramedics and in violation of standard orders of procedure and accepted emergency protocols, responded to a call for an unresponsive patient requiring CPR and

failed to prepare a run sheet or document in any way any evaluation or assessment

of Joseph Furio."

The complaint concluded: "[A]s a proximate result of one or more of these acts or omissions, Joseph Furio sustained injuries which resulted in his death on November 1, 2004."

On February 15, 2006, Park Ridge filed a section 2-619 motion to dismiss, asserting that it was immune pursuant to sections 6-105 and 6-106 of the Tort Immunity Act. 745 ILCS 10/6-105, 6-106 (West 2004). Specifically, Park Ridge asserted that it was immune from any claim alleging that it had a duty to evaluate or assess Joseph, or that it had a duty to document any such evaluation or assessment by section 6-105 of the Tort ImmunityAct, which states:

"Neither a local public entity nor a public employee acting within the

scope of his employment is liable for injury caused by the failure to make a

physical or mental examination, or to make an adequate physical or mental

examination of any person for the purpose of determining whether such person

has a disease or physical or mental condition that would constitute a hazard to the

health or safety of himself or others." 745 ILCS 10/6-105 (West 2004).

Park Ridge further averred that it was immune from any claim that it had a duty to diagnose Joseph by section 6-106 of the Act, which states:

"(a) Neither a local public entity nor a public employee acting within the

scope of his employment is liable for injury resulting from diagnosing or failing to

diagnose that a person is afflicted with mental or physical illness or addiction or

from failing to prescribe for mental or physical illness or addiction.

(b) Neither a local public entity nor a public employee acting within the scope of his employment is liable for administering with due care the treatment prescribed for mental or physical illness or addiction.

(c) Nothing in this section exonerates a public employee who has undertaken to prescribe for mental or physical illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury.

(d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury. 745 ILCS 10/6-106 (West 2004).

On March 8, 2006, Abruzzo filed an amended complaint similar in all relevant respects to the initial complaint but in which she additionally alleged that defendant "behaved with willful and wanton conduct in a manner which was in utter indifference and conscious disregard for the health and safety of decedent, Joseph Furio, in one or more of the following respects:

***

(d)     in disregard of the basic precepts of training for EMTs and paramedics and in violation of standard orders of procedure and

-4-

accepted emergency protocols, failed to transport Joseph Furio, a nonresponsive patient;

(e)     in disregard of the basic precepts of training for EMTs and paramedics and in violation of standard orders of procedure and accepted emergency protocols, responded to a call for a nonresponsive patient requiring CPR and failed to prepare a run sheet."

Attached to Abruzzo's amended complaint was a physician's report as required by section 2-622 of the Code (735 ILCS 5/2-622 (West 2002)).  That report states:

"Based upon my review of [a copy of the 911 tape, dispatch records and other documents from the City of Park Ridge, medical records and the autopsy report], there is reasonable and meritorious cause for filing an action against the City of Park Ridge, which provided emergency medical services in response to a 911 call placed by Lawrence Furio, the father of Joseph Furio., at 1:06 a.m. on October 31, 2004.

This call was placed by Lawrence Furio to request emergency medical assistance for his son, Joseph Furio, who was unresponsive and to whom he was providing CPR.  A fire engine and an ambulance, presumably manned by EMTs, paramedics, and fire fighters, were dispatched to and arrived at the Furio home. From the materials available, the EMTs and paramedics did not prepare a run sheet for this emergency response.  There is no record of any assessment or

treatment provided to Joseph Furio during this initial EMS response. It is clear that Joseph Furio was never transported from his home to any hospital. Basic principles of training for EMTs and paramedics, standing orders and protocols, and accepted emergency procedures required the responding emergency medical personnel to evaluate and to assess any person who has an altered mental status. Joseph Furio, who had a prior history of drug abuse, was unresponsive, and had required CPR from his father.

The treatment for an unresponsive person, who is presumed to have an altered mental status, requires initiation of advanced life support, as this is a potentially life threatening condition. Initiation of advanced life suppose [*sic*] (ALS) is required for any patient with a potentially life threatening condition like altered mental status or unconsciousness. ALS once initiated may not be discontinued unless approval is granted by a resource/associate hospital. Any child who is unresponsive has an altered level of consciousness. This condition requires treatment, including assessment of ABCs (airway, breathing, and circulation).

Another critical function of emergency medical service personnel is to convey patients with acute medical conditions safely to an appropriate medical facility.

After Joseph Furio had been assessed for his known altered mental status, it can only be presumed that he would have been transported to the hospital where

definitive care could be rendered. If, for some reason Joseph Furio's father, Lawrence Furio, refused medical treatment and transportation to the hospital, a signed refusal of treatment should have been obtained by the emergency medical personnel. No refusal of treatment is found in the provided records.

At 9:00 a.m. on October 31, 2004, a second 911 call for emergency medical services was made on behalf of Joseph Furio. At that time he was found in cardiac arrest. Resuscitation was begun and he was then transported to Resurrection Medical Center. Joseph Furio died as a result of anoxic encephalopathy due to cocaine and opiate intoxication.

The identified failures on the part of the emergency medical personnel were a proximate cause of the injuries and death sustained by Joseph Furio."

On May 11, 2006, Abruzzo filed a motion for leave to amend her first amended complaint and a response to defendant's motion to dismiss. In her motion to amend, Abruzzo requested to add the following allegations to her complaint to conform with the physician's report: that Park Ridge behaved with wilful and wanton conduct in one of more of the following respects:

"(f) responded to a request for emergency medical service for a patient in an altered mental status and failed to initiate advanced life support (ALS);

(g) responded to a request for emergency medical service for a patient in an altered mental status and failed to assess airway, breathing, and circulation;

(h) responded to a request for emergency medical service for a patient in

an altered mental status and, in disregard of the basic precepts of training for EMTs and paramedics and in violation of standing orders of procedure and accepted emergency protocols, failed to initiated advanced life support (ALS);

(i)   responded to a request for emergency medical service for a patient in an altered mental status and, in disregard of the basic precepts of training for EMTs and paramedics and in violation of standing orders of procedure and accepted emergency protocols, failed to assess airway, breathing, and circulation."

In her response to defendant's motion to dismiss, Abruzzo contended the immunities in sections 6-105 and 6-106 of Tort Immunity Act were inapplicable.  She contended that because Joseph was described as unresponsive during the 911 call, the EMTs were automatically required by standing orders of procedure as authorized by the Emergency Medical Services Systems Act (210 ILCS 50/1 *et seq*. (West 2004)) (EMS Act) to initiate treatment and that their failure to do so was not subject to immunity.

On June 28, 2006, the circuit court entered a memorandum opinion and order, granting defendant's motion with prejudice and stating:

"In this case, the paramedics failed to provide any evaluation, assessment, examination, diagnosis, treatment or documentation.  This is both alleged in the pleading and contained in the physician's report.  There is nothing in the proposed amendments to the pleading which alters this.  The allegations of the First Amended Complaint, supported by the facts and circumstances here and the physician's report, do fall squarely within the immunities provided in section 6-

No. 1-06-2116

105 and 6-106 of the Tort Immunity Act. Accordingly, the Defendant here is

immune from liability and this action is barred."

There is no record of any oral argument in this case.

## II. ANALYSIS

Section 2-619 of the Code provides a means for the disposition of issues of law and easily proved issues of fact. Mills v. County of Cook, 338 Ill. App. 3d 219, 221, 788 N.E.2d 169, 171 (2003). A section 2-619 motion admits the legal sufficiency of the complaint but raises some affirmative matter, appearing on the face of the complaint or established by external submissions, which defeats the plaintiff's claim. Mills, 338 Ill. App. 3d at 221, 788 N.E.2d at 171. Affirmative matter in this context means a defense that negates the plaintiff's cause of action. Illinois Graphics Co. v. Nickum, 159 Ill. 2d 469, 486, 639 N.E.2d 1282, 1290 (1994). Immunity under the Act qualifies as an affirmative matter properly raised in a section 2-619 motion to dismiss. Arteman v. Clinton Community Unit School District No. 15, 198 Ill. 2d 475, 479, 763 N.E.2d 756, 759 (2002). We review section 2-619 motions de novo. People ex rel. Devine v. Time Consumer Marketing, Inc., 336 Ill. App. 3d 74, 78, 782 N.E.2d 761, 764 (2002).

On appeal, Abruzzo contends that the general immunities contained in section 6-105 and 6-106 of the Tort Immunity Act are inapplicable because the EMS Act, which contains its own immunity provision, is more specifically directed to the instant facts. Abruzzo points to section 3.150(a) of the EMS Act, which states:

"Any person, agency or governmental body certified, licensed or authorized

pursuant to this Act or rules thereunder, who in good faith provides emergency or

-9-

non-emergency medical services *** in the normal course of conducting their duties, or in an emergency, shall not be civilly liable as a result of their acts or omissions in providing such services unless such acts or omissions ***constitute willful and wanton misconduct." 210 ILCS 50/3.150(a) (West 2004).

Abruzzo further contends that although the EMS Act applies to the exclusion of the Tort Immunity Act, there is no immunity in this case under the EMS Act because the EMTs and paramedics who responded to the Furio home were wilful and wanton in failing to provide any treatment whatsoever to Joseph.

Park Ridge contends that there is no conflict between the Tort Immunity Act and the EMS Act which would require a court to choose to apply the latter by reason of it being more specifically applicable to emergency personnel responding to a 911 call. Rather, Park Ridge contends that the two Acts apply to distinct situations without overlap and, therefore, there is no conflict in the fact that immunity under the EMS Act is subject to a wilful and wanton exception while no such exception exists under the Tort Immunity Act. Specifically, Park Ridge avers that the Tort Immunity Act immunizes pretreatment activities while the EMS Act only provides immunity once treatment has begun. In that regard, Park Ridge contends that only the immunities in sections 6-105 and 6-106 of the Tort Immunity Act apply in this case because absolutely no treatment was rendered to Joseph. Thus, according to Park Ridge, whether its EMTs and paramedics were wilful and wanton in failing to provide treatment is irrelevant because immunity under the Tort Immunity Act is not subject to a wilful and wanton exception.

In support of its position that the Tort Immunity Act and the EMS Act are not at odds

with one another but are in fact complimentary, Park Ridge first points to the general rule of statutory construction that, whenever possible, statutes are to be construed as being harmonious rather conflicting. As recently stated by our supreme court:

"The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. [Citation.] Our analysis begins with the statutory language, which remains the best indication of that intent. [Citation.] The language must be afforded its plain, ordinary, popularly understood meaning. [Citation.] When the language is unambiguous, the statute must be applied as written without resorting to other aids of construction. [Citation.]

However, when the plain language of one statute apparently conflicts with the plain language of another statute, we must resort to other means in determining the legislature's intent. Where two statutes conflict, we will attempt to construe them together, *in pari materia*, where such an interpretation is reasonable. [Citations.] We presume the legislature would not enact a law that completely contradicts an existing law without expressly repealing it. [Citation.] 'For a later enactment to operate as a repeal by implication of an existing statute, there must be such a manifest and total repugnance that the two cannot stand together.' [Citation.]" Moore v. Green, 219 Ill. 2d 470, 479, 848 N.E.2d 1015, 1020-21 (2006).

Thus, according to Park Ridge, although the Tort Immunity Act and the EMS Act are both apparently applicable to a municipality's rendering of emergency services, if we read the two statutes *in pari materia*, they do not conflict despite their differing standards. Park Ridge points out that sections 6-105 and 6-106 of the Tort Immunity Act provides that a public entity

will not be held liable for injuries resulting from: (1) failing to examine; (2) failing to adequately examine; (3) diagnosing; (4) failing to diagnose; and (5) failing to prescribe. 745 ILCS 10/6-105, 6-106 (West 2004). In contrast, the EMS Act states that any person licensed under the Act who *provides* emergency or nonemergency medical services will not be held liable for providing those services unless they act wilfully and wantonly. 210 ILCS 50/3.150(a) (West 2004). Thus, Park Ridge contends that the two statutes can be harmonized by reading the Tort Immunity Act as applying only to pretreatment matters and by reading the EMS Act as applying only once treatment has begun.

In further support of this position, Park Ridge cites Antonacci v City of Chicago, 335 Ill. App. 3d 22, 779 N.E.2d 428 (2002). In Antonacci, plaintiff, as the special administrator of the estate of decedent, brought suit against the city alleging that 911 personnel willfully and wantonly mistreated decedent's heart attack, resulting in his death. Antonacci, 335 Ill. App. 3d at 24, 779 N.E.2d at 429. The circuit court granted the city's section 2-619 motion to dismiss on the basis of immunity under sections 6-105 and 6-106 of the Tort Immunity Act. Antonacci, 335 Ill. App. 3d at 24, 779 N.E.2d at 429. On appeal, plaintiff argued that the Tort Immunity Act did not apply because the paramedics had correctly diagnosed the decedent with a "heart attack" and had begun to treat him. Antonacci, 335 Ill. App. 3d at 28, 779 N.E.2d at 432. The city countered that "heart attack" was too vague and general a diagnosis to trigger liability and that the paramedics could not begin to treat the patient until they learned whether he was in asystole. Antonacci, 335 Ill. App. 3d at 28, 779 N.E.2d at 432.

The appellate court in Antonacci began its analysis by addressing the scope of immunity

No. 1-06-2116

under sections 6-105 and 6-106 of the Tort Immunity Act:

> "[I]f governmental medical personnel do not examine the patient, they are immunized. 745 ILCS 10/6-105 (West 2000). If they fail to make a diagnosis or fail to prescribe treatment or if they make an incorrect diagnosis, they are immunized. 745 ILCS 10/6-106(a) (West 2000). But negligent or wrongful prescribing of treatment that results in harm is not immunized. 745 ILCS 10/6-106(c) (West 2000). Nor is there immunity for harm caused by a negligent or wrongful act or omission in administering the prescribed treatment after a correct diagnosis. 745 ILCS 10/6-106(d) (West 2000)." Antonacci, 335 Ill. App. 3d at 27, 779 N.E.2d at 431.

The court then cited American National Bank & Trust Co. of Chicago v. County of Cook, 327 Ill. App. 3d 212, 220, 762 N.E.2d 654, 632 (2001), where it was stated with regard to immunity under the Tort Immunity Act:

> " 'Once diagnosis of a medical condition is made and treatment of the condition is prescribed and undertaken, any subsequent prescription or examination required to be made pursuant to that condition is part of the patient's treatment.' " Antonacci, 335 Ill. App. 3d at 28-29, 779 N.E.2d at 433, quoting American National Bank, 327 Ill. App. 3d at 220.

The Antonacci court thus summarized: "In short, once the correct diagnosis is made and treatment for it is prescribed, all immunity bets are off." Antonacci, 335 Ill. App. 3d at 29, 779 N.E.2d at 433.

-13-

No. 1-06-2116

In contrast, the court noted that where no correct diagnosis is made, failure to treat a patient's undiagnosed condition, or wrongly treating a misdiagnosed condition, will be immunized under the Tort Immunity Act. Antonacci, 335 Ill. App. 3d at 30, 779 N.E.2d at 433-34, quoting Michigan Avenue National Bank v. County of Cook, 191 Ill. 2d 493, 512, 732 N.E.2d 528, 539 (2000) (applying the Tort Immunity Act where " 'the gravamen of plaintiff's action against defendants is that defendants' failure either to perform examinations or to adequately perform examinations led to defendant's failure to diagnose Collins' breast cancer, which, in turn, proximately caused her death' "); Marby v. County of Cook, 315 Ill. App. 3d 42, 57, 733 N.E.2d 737, 748 (2000) (holding that county was immune for failing to treat a pulmonary embolism it had failed to diagnose); Carr v. Cook County Hospital, 323 Ill. App. 3d 184, 189, 751 N.E.2d 119, 122 (2001) (applying Tort Immunity Act where hospital failed to treat or diagnose a ruptured tendon). After completing its analysis of the scope of sections 6-105 and 6-106, the Antonacci court decided to remand the case without ruling on the city's motion to dismiss, finding that the record was inadequate to determine whether the paramedics had reached a correct diagnosis which would then subject the city to liability for subsequent negligent treatment. Antonacci, 335 Ill. App. 3d at 31, 779 N.E.2d at 434.

Park Ridge contends that here, unlike in Antonacci, it is absolutely clear that the EMTs and paramedics who responded to Lawrence's 911 call provided absolutely no treatment for Joseph and did not reach a diagnosis. Thus, according to Park Ridge, it is also clear that the Tort Immunity Act must apply to defeat plaintiff's claim. However, while we might be inclined to accept Park Ridge's position and find immunity in this case by exclusively applying the analysis

-14-

No. 1-06-2116

of <u>Antonacci</u>, we note that neither <u>Antonacci</u> nor any of the cases cited in that case (see, *e.g.*,

<u>Michigan Avenue National Bank</u>, 191 Ill. 2d 493, 732 N.E.2d 528; <u>Marby</u>, 315 Ill. App. 3d 42,

733 N.E.2d 737; <u>Carr</u>, 323 Ill. App. 3d 184, 751 N.E.2d 119) addressed the EMS Act but, rather,

were faced solely with the question of whether immunity under the Tort Immunity Act was

applicable.  In that regard, we note that Park Ridge's interpretation of the EMS Act's immunity

provision – that it applies only once treatment has begun – is counter to our supreme court's

decision in <u>American National Bank & Trust Co. v. City of Chicago</u>, 192 Ill. 2d 274, 735 N.E.2d

551 (2000).[1]

    In that case, a woman suffering from an asthma attack called 911 requesting emergency

assistance.  <u>American National Bank</u>, 192 Ill. 2d at 276, 735 N.E.2d at 552.  Two paramedics

arrived at the woman's apartment, knocked on the front and back doors, and then left the scene

after receiving no response to their knocks. <u>American National Bank</u>, 192 Ill. 2d at 276, 735

N.E.2d at 553.  Later that day, the same paramedics returned to the apartment in response to a

second 911 call and, upon being let into the apartment by a neighbor, found the woman lying

dead on the floor. <u>American National Bank</u>, 192 Ill. 2d at 277, 735 N.E.2d at 553.  The

defendants claimed immunity under the EMS Act and under section 5-101 of the Tort Immunity

Act <u>American National Bank</u>, 192 Ill. 2d at 278, 735 N.E.2d at 553.

    The supreme court first rejected the defendant's claim of immunity under section 5-101

the Tort Immunity Act (745 ILCS 10/5-101 (West 1994))  <u>American National Bank</u>, 192 Ill. 2d

---

[1]For sake of clarity, we emphasize that this case is unrelated to <u>American National Bank</u>

<u>& Trust Co. of Chicago v. County of Cook</u>, 327 Ill. App. 3d 212, 762 N.E.2d 654, as cited above.

at 280-81, 735 N.E.2d at 555. That section provided: "Neither a local public entity nor a public employee is liable for failure to establish a fire department or otherwise to provided fire protection, rescue or other emergency service." 745 ILCS 10/5-101 (West 1994). The court held that section 5-101 applied only where a local public entity has not established a fire department or rescue service as opposed to where such services have been established but not provided in a single case. American National Bank, 192 Ill. 2d at 280-81, 735 N.E.2d at 555. Notably, the sections of the Tort Immunity Act implicated in the instant case, sections 6-105 and 6-106, were not raised by the parties or addressed by the court in American National Bank.

With regard to the immunity under the EMS Act, however, the court remanded for a determination of whether the paramedics' failure to attempt to enter the decedent's apartment constituted wilful and wanton conduct beyond the immunity provided in the EMS Act. American National Bank, 192 Ill. 2d at 286, 735 N.E.2d at 558. In reaching its decision, the court explicitly rejected the plaintiff's position that the EMS Act's immunity provision could only apply "when paramedics have actually rendered life support treatment to a patient." The court stated:

"We do not believe that the scope of section 17(a) [a precursor to section 3.150 of the EMS Act as cited in this case] is as narrow as the plaintiff believes it to be. We conclude that the provision applies to this case, even though the acts and omissions alleged here do not relate to the actual rendition of life support treatment. Although the EMS Act does not define the general term 'life support services,' we do not believe that we are limited, in interpreting section 17(a), by

the specialized meanings assigned to the terms 'advanced life support-mobile intensive cares services,' and 'basic life support services,' and 'intermediate life support services.' Those definitions are designed to distinguish one level or form of care from another, and the legislature could reasonably have decided to omit from the definitions conduct that is common to them all or, though preparatory to the actual rendering of medical care, is no less an integral part of providing life support services. Moreover, section 17(a) also refers to the transportation of patients. If transporting a patient to a hospital is an aspect of life support services, then so too is locating a patient in the first place. Other provisions in the EMS Act also demonstrate that the immunity provisions of section 17 apply in these circumstances. Elsewhere, the Act regulates matters such as communications, response time, and standards for ambulance operation. 210 ILCS 50/7, 7.1, 9 (West 1994). These additional measures are evidence of the Act's broad scope, and of the equally broad meaning we believe must be given to the term 'life support services' in the immunity provisions." American National Bank, 192 Ill. 2d at 283, 735 N.E.2d at 556.

Thus, contrary to Park Ridge's position, it would seem that if immunity under the EMS Act could apply where paramedics fail to enter an apartment of a 911 caller who happens to be inside but unable to answer the door, the same immunity could also potentially apply in this case, where it is stated in the pleadings that the EMTs and paramedics arrived at the house of the decedent but failed to examine, treat, or diagnose him. We note that the EMS Act has since been

amended. As discussed in American National Bank, section 17(a) applied to "[a]ny person, agency or governmental body *** who in good faith provides *life support services*" (emphasis added) (see 210 ILCS 50/17(a) (West 1994)), while the amended section 3.150 as applicable in this case, addresses "[a]ny person, agency or governmental body *** who in good faith *provides emergency or non-emergency medical services*" (emphasis added) (210 ILCS 50/3.150 (West 2004)). However, despite this difference, we cannot say that the newer version is any less broad than the version applicable in American National Bank. Thus, Park Ridge's attempt to harmonize the two Acts by reading the Tort Immunity Act as applying to pretreatment matters and the EMS Act to matters involving actual treatment cannot be sustained.

However, if immunity under the EMS Act, which specifically applies to "provid[ing] emergency or non-emergency medical services," can be applied where the emergency responders have not even seen the person in need of medical assistance, it would appear that immunity under this Act would, in fact, overlap the immunities in sections 6-105 and 6-106 of the Tort Immunity Act, which, as noted, apply to the failure to examine, the failure to adequately examine, diagnosis, the failure to diagnose, and the failure to prescribe. Abruzzo has alleged that the responding EMTs and paramedics failed to evaluate or assess Joseph. This allegation falls squarely within the Tort Immunity Act's immunity for failure to examine. Thus, we are yet faced with two potentially applicable immunity provisions – one which provides limited immunity and one which provides absolute immunity.

In this regard, we must emphasize that although the supreme court in American National Bank held that the immunity provision of the EMS Act and not that in section 5-101 of the Tort

Immunity Act was applicable to facts similar to those at hand, the immunities granted to local public entities and employees in sections 6-105 and 6-106 of the Tort Immunity Act were apparently never raised or invoked in that case. Consequently, the court did not address whether the immunity provided by the EMS Act should operate to the exclusion of the immunities in sections 6-105 and 6-106. Moreover, the court did not hold that the immunity provided by section 5-101 of the Tort Immunity Act was preempted by the immunity provision of the EMS Act, but merely held that section 5-101 was inapplicable because the defendant in that case had established a fire department with emergency services. In fact, for the reasons that follow, we believe that had the defendant in American National Bank raised section 6-105 as an affirmative defense instead of section 5-101, the supreme court would have applied the absolute immunity of that section over the limited immunity provided under the EMS Act pursuant to its reasoning and analysis in Henrich v. Libertyville High School, 186 Ill. 2d 381, 712 N.E.2d 298 (1999).

In Henrich, the supreme court held that the defendant school was protected by the absolute immunity of the Tort Immunity Act without being subject to a willful and wanton exception as included in an immunity provision of the School Code. Henrich, 186 Ill. 2d at 391, 712 N.E.2d at 304. In that case, a high school student had spine fusion surgery and was permanently restricted from any contact sports in physical education class. Henrich, 186 Ill. 2d at 384, 712 N.E.2d at 300. The high school knew of the restriction, but a substitute teacher required the student to participate in a water basketball game which left the student severely and permanently injured. Henrich, 186 Ill. 2d at 384, 712 N.E.2d at 300. The school claimed immunity under section 308(a) of the Tort Immunity Act, which provided: "[N]either a local

No. 1-06-2116

public entity nor a public employee is liable for an injury cause by a failure to supervise an activity on or the use of any public property." 745 ILCS 10/3-108(a) (West 1994).[2] The plaintiff claimed that the School Code's liability provision in section 24-24 applied to the exclusion of the Tort Immunity Act. Henrich, 186 Ill. 2d at 389, 712 N.E.2d at 303. Section 24-24 conferred on educators *in loco parentis* status, which meant that educators would not be held liable for ordinary negligence, but only for conduct that was willful and wanton. Henrich, 186 Ill. 2d at 389, 712 N.E.2d at 303.

The Henrich court found that although the immunities under the Tort Immunity Act and under the School Code appeared to conflict, they actually each stood in their own sphere. Henrich, 186 Ill. 2d at 392, 712 N.E.2d at 304. The court explained:

"Section 24-24 of the School Code applies equally to public and private schools. [Citations.] In contrast, the Tort Immunity Act does not apply to private schools, but only to public schools. [Citation.] Although 'public and private schools may sometimes be classified together in light of the similarity of their functions and activities *** it does not follow that the legislature is required to adopt that classification in the *** Tort Immunity Act.' [Citation.] By the plain language of section 3-108(a) of the Tort Immunity Act, the legislature has chosen to grant public school teachers and public school districts greater immunity than private school teachers and private schools.

_____

[2]We note that section 3-108(a) of the Tort Immunity Act has since been amended to include a willful and wanton exception. See 745 ILCS 10/3-108(a) (West 2004).

-20-

No. 1-06-2116

By giving effect to the plain language of section 3-108(a) of the Tort Immunity Act, we effectuate the purposes of both section 3-108(a) and section 24-24 of the School Code. The Act itself states that its purpose is 'to protect local public entities and public employees from liability arising from the operation of government.' [Citations.]" Henrich, 186 Ill. 2d at 392-93, 712 N.E.2d at 304.

Although not argued by appellant, the supreme court in Moore v. Green, 219 Ill. 2d 470, 485-87, 848 N.E.2d 1015, 1024-26 (2006), did not purport to depart from its reasoning in Henrich, which it distinguished and preserved. In Moore, the court held that the defendant city and police officers were only protected by the limited immunity provided under the Domestic Violence Act and not the absolute immunity of the Tort Immunity Act. Moore, 219 Ill. 2d at 488, 848 N.E.2d at 1026. In that case, plaintiff, an independent administrator for the estate of decedent, brought wrongful death and survival actions against the city and police officers based on the police officers' conduct in failing to assist the decedent, who had called 911 because her husband had entered her home in violation of an order of protection. Moore, 219 Ill. 2d at 474-75, 848 N.E.2d at 1018. Defendants argued that they were immune under sections 4-102 and 4-107 of the Tort Immunity Act. Moore, 219 Ill. 2d at 475, 848 N.E.2d at 1018. Section 4-102 provided in relevant part that neither local public entities nor public employees could be held liable for "failure to provided adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4-102 (West 2002). Section 4-107 provided: "Neither a local public entity nor a public employee is liable for an injury caused by the failure to make an arrest ***."

-21-

No. 1-06-2116

745 ILCS 10/4-107 (West 2002). The court noted that both these sections provided absolute immunity. Moore, 219 Ill. 2d at 478, 848 N.E.2d at 1020, citing Barnes v. Chicago Housing Authority, 326 Ill. App. 3d 710, 720 (2001); Hernandez v. Kirksey, 306 Ill. App. 3d 912, 917 (1999).

Plaintiff, however, contended that section 305 of the Illinois Domestic Violence Act of 1986 (750 ILCS 60/305 (West 2002)), which provided limited immunity for failing to render emergency assistance or enforce the statute "trumped" sections 4-102 and 4-107. Moore, 219 Ill. 2d at 475, 848 N.E.2d at 1018. Section 305 of the Domestic Violence Act provided:

"Any act of omission or commission by any law enforcement officer acting in good faith in rendering emergency assistant or otherwise enforcing this Act shall not impose civil liability upon the law enforcement officer or his or her supervisor or employer, unless the act is a result of willful or wanton misconduct." 750 ILCS 60/305 (West 2002).

The court noted that the immunities under both the Tort Immunity Act and the Domestic Violence Act appeared to apply to its facts; therefore, the court was left to determine which statute should govern. Moore, 219 Ill. 2d at 478-79, 848 N.E.2d at 1020. As cited above, the court discussed the general rules of statutory construction: that courts must give effect to the legislature's intent, that statutory language is the best indication of that intent, and that statutory language must be afforded its plain and ordinary meaning. Moore, 219 Ill. 2d at 475, 848 N.E.2d at 1018. The court further stated that where two statutes conflict, courts will attempt to construe them together, *in pari materia*, and that courts will presume that the legislature would not enact a

-22-

No. 1-06-2116

law that completely contradicts an existing law without expressly repealing it. Moore, 219 Ill. 2d at 475, 848 N.E.2d at 1018. " 'For a later enactment to operate as a repeal by implication of an existing statute, there must be such a manifest and total repugnance that the two cannot stand together.'" Moore, 219 Ill. 2d at 479, 848 N.E.2d at 1018, quoting Jahn v. Troy Fire Protection District, 163 Ill. 2d 275, 280, 644 N.E.2d 1159, 1161 (1994). Further, the court stated:

> "Where a general statutory provision and a more specific statutory provision relate to the same subject, we will presume that the legislature intended the more specific provision to govern. [Citation.] Similarly, we will presume that the legislature intended the more recent statutory provision to control. [Citation.]" Moore, 219 Ill. 2d at 480, 848 N.E.2d at 1021.

The court found persuasive support for its holding in the Domestic Violence Act's underlying policy to recognize "that domestic violence is a serious crime," to recognize "that the legal system has failed to protect and assist domestic violence victims," and to help "victims of domestic violence to avoid further abuse by promptly entering and diligently enforcing orders of protection, and expanding the civil and criminal remedies for victims." Moore, 219 Ill. 2d at 483, 848 N.E.2d at 1023, citing Calloway v. Kinkelaar, 168 Ill. 2d 312, 320, 659 N.E.2d 1322, 1326 (1995). The Domestic Violence Act specifically states:

> "This Act shall be liberally construed and applied to promote its underlying purposes, which are to:
>
> ***
>
> "(3) Recognize that the legal system has ineffectively dealt with family

-23-

violence in the past, allowing abusers to escape effective prosecution or financial liability, and has not adequately acknowledged the criminal nature of domestic violence; that, although many laws have changed, in practice there is still widespread failure to appropriately protect and assist victims; [and]

\*\*\*

(5)  Clarify the responsibilities and support the efforts of law enforcement officers to provide immediate, effective assistance and protection for victims of domestic violence \*\*\*."  750 ILCS 60/102 (West 2002).

The Moore court stressed that this underlying purpose was clear, stating: "The structure of that Act reflects a comprehensive statutory scheme for reform of the legal system's historically inadequate response to domestic violence.  The Domestic Violence Act, in effect, is an omnibus source for rules regarding such cases. \*\*\* Most importantly for this case, it details the responsibilities of law enforcement officers. [Citation.] As we noted in Calloway, '[t]hese provisions reveal the General Assembly's intent to encourage active intervention on the part of law enforcement officials in cases of intrafamily abuse.' [Citation.]"  Moore, 219 Ill. 2d at 488-89, 848 N.E.2d at 1026.

The court noted that the immunity provision of the Domestic Violence Act "works in concert" with section 304 of the Act, which creates specific duties applicable to law enforcement. Moore, 219 Ill. 2d at 490, 848 N.E.2d at 1027.  Specifically, section 304 states: "Whenever a law enforcement officer has reason to believe that a person has been abused, neglected, or exploited

by a family or household member, the officer shall immediately use all reasonable means to prevent further abuse, neglect, or exploitation ***." 750 ILCS 60/304 (West 2002). The section goes on to enumerate several specific means law enforcement officers can take to prevent further abuse, including, for example, to make arrests, seize weapons, accompany the victim to his or her residence, or to provide the victim with a referral to a service agency. 750 ILCS 60/304 (West 2002).

The court explained that the partial immunity provided under the Domestic Violence Act "is a direct expression of legislative intent to reconcile the strongly worded purposes of the Act *** with the recognition that officers performing their legal duties should not be held civilly liable when their efforts to enforce the Act fall short, *unless* the conduct in question can be viewed as willful and wanton.' (Emphasis in original.)" Moore, 219 Ill. 2d at 484, 848 N.E.2d at 1023, quoting Calloway, 168 Ill. 2d at 322, 659 N.E.2d at 1327. In other words, law enforcement officers who disregard their duties under the Domestic Violence Act will not enjoy absolute immunity from liability, but will only be shielded up until the point where their failure to uphold the Domestic Violence Act becomes willful and wanton.

The Moore court distinguished its facts from those in Henrich, where, as noted, absolute immunity under section 3-108(a) of the Tort Immunity Act was pitted against the limited immunity in sections 24-24 of the School Code (105 ILCS 5/24-24 (West 2002)). Moore, 219 Ill. 2d at 485-87, 848 N.E.2d at 10124-26. The court noted that unlike the statutes involved in Henrich, the Tort Immunity Act and the Domestic Violence Act "do not stand in their own spheres, but rather vie for the same sphere." Moore, 219 Ill. 2d at 487, 848 N.E.2d at 1025. The

No. 1-06-2116

court explained:

"Such a dichotomy between municipal and nonmunicipal defendants is not reasonable in this case. It would pervert the broad purposes of the Domestic Violence Act to conclude that the immunity created by section 305 was intended to apply only to law enforcement agencies and agents beyond the Tort Immunity Act's shield, who are less likely to investigate domestic violence calls or to enforce the Act. The reading advanced by the defendant threatens to reduce the duties in the Domestic Violence Act to precatory admonitions." Moore, 219 Ill. 2d at 488, 848 N.E.2d at 1025-26.

Comparing Henrich and Moore to the instant case, we find more similarities to the former supreme court decision. Here, the applicable provisions of the Tort Immunity Act apply to local public entities and public employees, while the immunity provision of the EMS Act applies to "any person, agency or governmental body certified, licensed or authorized pursuant to this Act *** who in good faith provides emergency or non-emergency medical services." Thus, the EMS Act, like the School Code in Henrich, applies to public and private entities, while the immunity provision of the Domestic Violence Act, as addressed in Moore, applied solely to law enforcement officers and their employers, who would be within the public realm.

Furthermore, the strong policy reasons articulated in Moore for limiting immunity under the Domestic Violence Act are not prevalent here. The EMS Act's stated purpose is

"to provide minimum standards for the statewide delivery of EMS services. It is recognized, however, that diversities exist between different areas of the State

-26-

***. The Legislature therefore intends that the implementation and enforcement of this Act by the Illinois Department of Public Health accommodate those varying needs and interests to the greatest extent possible without jeopardizing appropriate standards of medical care ***." 210 ILCS 50/2 (West 2004).

Unlike the Domestic Violence Act, there is no indication in the EMS Act that it was enacted to remedy previous shortcomings in the provision of emergency services. More importantly, however, unlike the Domestic Violence Act, which is the source of both duties and immunities (see 750 ILCS 60/304 (West 2002); Moore, 219 Ill. 2d at 489), the EMS Act does not purport to impose any duties on EMTs and paramedics to provide emergency services but protects them with immunity from ordinary negligence in the event they do respond and provide such services. (see 210 ILCS 50/1 *et seq*. (West 2004)). Any such duties would have to come from other sources.[3]

---

[3]Arguably, the policy behind the immunity provision of the EMS Act is different from that behind the immunity provision of the Domestic Violence Act. As noted in Moore, the legislature limited the immunity available to law enforcement officers with respect to their duties under the Domestic Violence Act in order to encourage enforcement of those laws by penalizing willful and wanton noncompliance. See Moore, 219 Ill. 2d at 484, 848 N.E.2d at 1023. On the other hand, the EMS Act, insofar as it includes private and public EMS personnel, is tied into the immunity under the Good Samaritan Act, which is intended to encourage people to provide emergency assistance by ensuring them that their intervention will not incur liability for ordinary negligence. See 210 ILCS 50/3.150(c) (West 2004); 745 ILCS 49/2 (West 2004). Thus, the

No. 1-06-2116

Thus, unlike in Moore, we do not find that extending absolute immunity under sections 6-105 and 6-106 of the Tort Immunity Act to the activities of municipal EMTs and paramedics would pervert the purpose of the EMS Act. See Moore, 219 Ill.2d at 488, 848 N.E.2d at 1023. The plain language of sections 6-105 and 6-106 states that neither local public entities nor public employees are liable for injury caused by failure to examine, failure to adequately examine, diagnosing, failing to diagnose, or failing to prescribe. 745 ILCS 10/6-105, 6-106 (West 2004). Here, it is apparent from Abruzzo's complaint and attached physician's report that defendant's EMTs and paramedics did not examine, diagnose, prescribe, or otherwise treat the decedent. It is also clear that Park Ridge is a local public entity. Accordingly, we find that Park Ridge was immune under the Tort Immunity Act.

Abruzzo, however, additionally contends that defendant is not immune under Tort Immunity Act because a correct diagnosis had, in fact, been made and there were set protocols that the EMTs and paramedics failed to follow. Although Abruzzo concedes that the EMTs and paramedics never examined Joseph, she contends that a diagnosis had already been made prior to their arrival, namely, that he was an "unresponsive patient." Although not specifically articulated by Abruzzo, this "diagnosis" of unresponsiveness appears to have occurred during Lawrence's 911 call. However, whether it was Lawrence, the 911 operator, or some other party who came to this "diagnosis" is unclear. In any event, Abruzzo contends that no further diagnosis was

Domestic Violence Act seeks to encourage intervention by police by removing the shield of immunity from willful and wanton refusals to act, while the EMS Act seeks to encourage action by providing more protection than would ordinarily be available.

-28-

necessary because given the symptom of "unresponsiveness," the standing orders of procedure (as attested to in Abruzzo's pysician's report) required that the EMTs and paramedics initiate "advanced life support," assess the patient's airway breathing and circulation (the ABCs), and transport the patient to an appropriate medical center. Thus, according to Abruzzo, once the correct diagnosis of unresponsiveness was made, there was no immunity for the EMTs' and paramedics' subsequent negligence and willful and wanton conduct in failing to follow set protocols. In support, Abruzzo cites Antonacci, where the court stated with regard to American National Bank v. County of Cook:

> "The correct diagnosis had been made at the hospital; there could be no immunity for actions that take place or are omitted in the course of administering the prescribed treatment based on that correct diagnosis. That absence of immunity applies to an incorrect subsequent prescription or examination or to a prescription, examination, or *treatment that did not take place at all*." (Emphasis added.) Antonacci, 335 Ill. App. 3d at 29, 779 N.E.2d at 434.

We find Abruzzo's contention unavailing. As discussed in Michigan Avenue National Bank, "diagnosis" has been defined as:

> " the 'art or act of identifying a disease from its signs and symptoms,' and as an 'investigation of analysis of the cause or nature of a condition, situation, or problem.' Webster's Third New International Dictionary 622 (1993). The Sloan-Dorland Annotated Medical-Legal Dictionary defines 'diagnosis' as 'the art of distinguishing one disease from another' and as 'the determination of the nature of

a case of disease.' Sloan-Dorland Annotated Medical-Legal Dictionary 199 (1987). See also Attorney's Dictionary of Medicine D-102 (1999) ('diagnosis' is defined as '[t]he determination of what kind of disease a patient is suffering from, especially the art of distinguishing between several possibilities'); Black's Law Dictionary 464 (7th ed. 1999) (defining 'diagnosis' as '[t]he determination of a medical condition (such as disease) by physical examination or by study of its symptoms')." Michigan Avenue National Bank, 191 Ill. 2d at 510-11, 732 N.E.2d at 538.

Given this plain and ordinary meaning of the word "diagnosis," we reject Abruzzo's contention that a diagnosis had been made. It may well be that Lawrence described his son as unresponsive during the 911 call; however, even if we set aside the issue of whether a lay person is capable of making a diagnosis for purposes of section 6-106, the characterization of unresponsiveness does not fall within the aforementioned definitions of diagnosis. Rather, it would appear to be merely a symptom of some underlying condition or disease. In this case, that condition or disease seems to have been injury from drug abuse, but what that underlying injury entailed was not unresponsiveness. In other words, Joseph's injury was not unresponsiveness and he did not die from that symptom; rather, unresponsiveness was merely one outward manifestation of an underlying problem that was not diagnosed by Lawrence, the 911 operator, or any of the responding EMTs or paramedics, at least according to the record we have before us. As stated in the physician's report, Joseph ultimately died over eight hours after the first 911 response from anoxic encephalopathy.

Moreover, even if the standing orders of procedure required that EMTs and paramedics address the condition of unresponsiveness in a certain manner, that requirement would not, in itself, take the matter outside the purview of the immunities in sections 6-105 and 6-106 of the Tort Immunity Act, because immunity under these sections is only lost once a correct diagnosis is made. Antonacci, 335 Ill. App. 3d at 29, 779 N.E.2d at 434. As repeatedly stated by our supreme court, the Tort Immunity Act "does not create duties, but merely enumerates immunities which apply to certain government operations." Moore, 219 Ill. 2d at 477, 848 N.E.2d at 1023, citing Epstein v. Chicago Board of Education, 178 Ill. 2d 370, 381, 687 N.E.2d 1042 (1997); see also Arteman v. Clinton Community Unit School District No. 15, 198 Ill. 2d 475, 479, 763 N.E.2d 756, 760 (2002). Thus, regardless of whether the defendant's EMTs and paramedics were duty bound by certain administrative protocols once having received a 911 call describing a person as unresponsive, that duty to respond in a certain manner does not alter the clear statement in sections 6-105 and 6-106 that local public entities will not be held liable for a failure to examine, a failure to adequately examine, diagnosis, a failure to diagnose, or a failure to prescribe. See 745 ILCS 10/6-105, 6-106 (West 2004).

## III. CONCLUSION

For all the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

McNULTY and O'MALLEY, JJ., concur.