# Illinois Official Reports

## Appellate Court

---

**Abruzzo v. City of Park Ridge, 2013 IL App (1st) 122360**

---

| | |
|---|---|
| Appellate Court Caption | JO ANN ABRUZZO, Independent Administrator of the Estate of Joseph Furio, Deceased, Plaintiff-Appellee, v. THE CITY OF PARK RIDGE, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-2360 |
| Filed | December 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for wrongful death, survival, and family expenses arising from the death of plaintiff's son after paramedics from defendant city initially came to plaintiff's residence in response to a 9-1-1 call and then left, and then a different team was called later and transported the son to a hospital where he was pronounced brain dead, the trial court's judgment for plaintiff on retrial following a remand from the Illinois Supreme Court was affirmed, since the record showed that plaintiff's complaint was initially dismissed by the trial court on the ground that defendant was immune under the Tort Immunity Act, the appellate court upheld that decision, but the Illinois Supreme Court reversed that judgment, held that the limited immunity provision of the Emergency Medical Services (EMS) System Act applied and remanded the cause for a new trial, and the judgment for plaintiff at the new trial was upheld by the appellate court, since the evidence, including defendant's admission that the first paramedics who responded did not provide any services, established that they were guilty of an "omission" in providing services for purposes of the Act and exposed defendant to liability. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-1262; the Hon. Clare McWilliams, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Richard A. Devine, Scott M. Seaman, and Jason R. Schulze, all of Meckler Bulger Tilson Marick & Pearson LLP, of Chicago, and Jay S. Judge and Michael E. Kujawa, both of Judge, James & Kujawa, LLC, of Park Ridge, for appellant. |
|---|---|
| | Lisa A. Jensen, of Jensen Law Office, LLC, of Rockford, and Frank DiFranco, of DiFranco & Associates, P.C., of Park Ridge, for appellee. |
| | Edward F. Dutton, of Park District Risk Management Agency, of Lisle, for *amicus curiae* Illinois Governmental Association of Pools. |
| Panel | PRESIDING JUSTICE HOWSE delivered the judgment of the court, with opinion. Justices Quinn and Lavin concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff, Jo Ann Abruzzo, as independent administrator of the estate of Joseph Furio, deceased, filed a complaint and first amended complaint for wrongful death, survival, and family expenses against defendant, the City of Park Ridge (Park Ridge or the City). The complaint arose from the City's response to a request for emergency services (9-1-1 call) by decedent's father, Larry Furio, for his son Joseph. The City's paramedics responded to a call at Larry Furio's home at approximately 1 a.m. and left without taking Joseph to the hospital. Joseph had been conscious during the first call. Larry Furio called a second time later that same morning and different paramedics responded. Joseph was unconscious. The paramedics transported Joseph to the hospital. Joseph never regained consciousness, was later pronounced brain dead, and was removed from respirators.

¶ 2    Plaintiff's first amended complaint alleged, in part, that in response to the first 9-1-1 call the paramedics failed to evaluate or assess Joseph and as a proximate result, Joseph sustained injuries resulting in death, and the paramedics behaved with wilful and wanton conduct in failing to transport Joseph, a nonresponsive patient. On April 14, 2006, defendant filed a motion to dismiss. Plaintiff filed a response, and on June 9, 2006, defendant filed its reply brief. The trial court granted the motion and on appeal this court held that the City was immune pursuant to sections 6-105 and 6-106 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/6-105, 6-106 (West 2004)). *Abruzzo v. City of Park Ridge*, 374 Ill. App. 3d 743, 759 (2007) (*Abruzzo I*).

¶ 3        Sections 6-105 and 6-106 provide absolute immunity from liability to a local public entity for failure to evaluate, diagnose, or prescribe treatment for an illness or physical condition. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 329 (2008) (*Abruzzo II*). Our supreme court reversed this court's judgment that absolute immunity under the Tort Immunity Act applies, holding that the limited immunity provision in the Emergency Medical Services (EMS) System Act (EMS Act) (210 ILCS 50/1 *et seq*. (West 2008)) governs over sections 6-105 and 6-106 of the Tort Immunity Act. *Abruzzo*, 231 Ill. 2d at 348. Our supreme court found that the EMS Act controlled because it was the more specific and more recent statute. *Id*. The court interpreted the provision of emergency medical services to include preparatory actions integral to providing emergency treatment and found that assessment and evaluation are integral to providing emergency medical services. *Id*. at 345. The court held that the immunity provision of the EMS Act applied to the allegations in plaintiff's complaint because "[t]he failure to assess or examine is an 'omission' in providing emergency medical services under our interpretation of the immunity provision [in the EMS Act]." *Id*. at 345. The court remanded the case to the trial court. *Abruzzo*, 231 Ill. 2d at 348.

¶ 4        This appeal arises from the trial of the matter following remand by our supreme court. Following trial, the jury returned a verdict in favor of plaintiff and awarded damages totaling $5,187,500. For the reasons set forth below, we affirm the verdict and judgment.

¶ 5                                          BACKGROUND

¶ 6        Following remand by our supreme court, the matter proceeded to a trial before a jury on plaintiff's first amended complaint.

¶ 7        Larry Furio, Joseph's father, testified that he picked his son up from his mother's house and took him home at approximately 11:15 p.m. on October 30, 2004. Two weeks earlier, Joseph had finished an inpatient drug rehabilitation program. Sometime after Joseph went to bed, Larry heard a gasping sound from Joseph's room. Larry went to Joseph's room to find Joseph "like blue" and "gasping for breath." He was purple around the mouth and clammy. Joseph made a few more gasping noises and then no sound. Joseph was not breathing. Larry could not wake him so he attempted cardiopulmonary resuscitation (CPR). Joseph still did not waken so Larry dialed 9-1-1 while continuing to attempt CPR. At some point, Joseph was able to say some words but his speech was slurred, he appeared groggy, and his eyes were glassy. Before paramedics arrived, Larry was able to ask Joseph if he had used any drugs and Joseph responded he had not. Paramedics arrived while Larry was still on the phone with the 9-1-1 operator. Larry Furio testified he told paramedics he thought the problem could be asthma and he believes that he told them he had been attempting CPR.

¶ 8        Larry testified that when he entered Joseph's room after paramedics arrived, he shook Joseph and Joseph sat up and asked what those people were doing here. Larry testified he told Joseph he (Larry) had come into his room and Joseph was purple, could not breathe, and Larry could not wake him up. Joseph then said to his father, "dad, it's these pills that I'm taking, they make me tired." Larry testified that one of the paramedics was in the room when Joseph made the statement about the pills. Larry testified that in response, "the paramedic kind of rolled his eyes like with an attitude, like why would you bother calling us, like he was put out." Larry

- 3 -

stated someone said words to the effect of "He looks alright I guess." and left. Larry testified that as the paramedics left he made a sarcastic comment that "gosh, I'm sorry I bothered you."

¶ 9    William Peterson was a paramedic employed by defendant on October 31, 2004, and is still so employed. He and paramedic Franzen were dispatched to Larry Furio's home at approximately 1:06 a.m. on the morning of October 31, 2004. Paramedic Peterson testified that he was required to follow the standard operating procedures (SOPs) of the Saint Francis EMS system. Those SOPs include a general patient assessment. Peterson testified that according to the general assessment SOP, as part of the primary survey he was required to assess circulation by comparing pulses and checking capillary refill. Peterson did not check Joseph's pulses or his capillary refill. Plaintiff impeached Peterson with his deposition testimony in which Peterson stated that if Joseph's father indicated Joseph was having difficulty breathing and had a history of asthma, he would be required to follow the SOP for asthma. Peterson testified that Joseph's father never stated that his son was having trouble breathing. But he did testify that when the call was dispatched, the call was for a 15-year-old with difficulty breathing.

¶ 10    Peterson denied that Joseph's father told the paramedics that his son was unconscious and not breathing, and he denied later telling his battalion chief that was what Joseph's father said. At trial, Peterson testified that Joseph's father told them it was a false alarm and that their services were not needed. Peterson testified at trial that he entered the home and walked down a hallway toward Joseph's bedroom without having any conversation with his father on the way, and he never entered the bedroom. Joseph's father entered the bedroom with Franzen and a police officer. Peterson could see Joseph in the bedroom sitting up on his arms in the bed. Joseph said something similar to "Why are these people here?" and "I just want to go back to sleep." Peterson stayed approximately 10 seconds before leaving to meet a fire engine that also responded to the call. He never returned.

¶ 11    Peterson testified that under the SOP a primary survey of airway, breathing, and circulation (ABCs) is made and, based on those, he is to determine how much further to go within his assessment of the patient. Peterson testified he did a visual assessment while looking at Joseph, but did not do a hands-on assessment. Peterson could determine that Joseph had a patent airway and was breathing from the fact that he was sitting up and talking and based on the color of his skin, which is an indication that oxygen is perfusing through his body. Peterson has seen people's skin that was discolored from a lack of oxygen. The lips start to turn blue, the skin will become pale and, depending on the severity, the skin may take on an ashen, grayish-blue color. Peterson could see that Joseph's skin appeared to be a normal color. Peterson also testified that circulation can be checked visually without checking the subject's capillary refill. A capillary refill test involves squeezing the nail bed of a finger and counting the time required for color to return to the nail bed. Peterson testified he did not believe it was necessary to do a capillary refill test on Joseph because he was breathing and had the proper skin color. Peterson testified that he would only compare pulses to check circulation if he were working farther down into the secondary survey, but it is not something that is done if on visual examination circulation appears normal. The next step in the primary survey is to check for disability, which is to determine the patient's level of alertness. Peterson testified Joseph appeared to be alert based on his knowing that there were other people in the room and his question to his father as to who

- 4 -

the people in his room were and why they were there. The SOP for primary assessment instructs paramedics to determine patient status, which Peterson testified means to determine whether in fact there is a patient. Peterson testified that from what he observed he determined they actually did not have a patient, at which point he would not continue to do the secondary survey. Peterson testified:

> "I believe that we didn't have a patient. The father, whatever he thought, when he made the phone call, when we got there he stated that he overreacted to whatever that situation was. He said the boy was fine. The boy said he was fine, asking what these people were doing here.
>
> We made a determination that we did not have a patient to treat any further."

¶ 12    Peterson received no information regarding any attempt at CPR on Joseph, no information regarding suspected drug use, and no information that Larry Furio had trouble waking his son. If Peterson were on a call and was aware that CPR had been performed on the patient, he would further evaluate the patient and find out why CPR was performed. If he was aware of a history of drug abuse, if there was a question as to whether the patient was conscious, or if the patient was having difficulty breathing, it would affect the assessment that he does. Also, if there was information about the patient taking medications or a question of how much the patient took, or if the patient took the wrong medication, that information would affect what Peterson did. Peterson testified he had no information to indicate that Joseph was on medications on October 31, 2004.

¶ 13    Peterson did not ask Joseph's father what he had done for his son before paramedics arrived, if Joseph was taking medication, had a history of asthma, or was on drugs. Peterson did not ask Joseph if he was having difficulty breathing because he did not think it was necessary. Peterson did not feel there were any questions to ask based on visually assessing Joseph, what his father said to the paramedics, and what Joseph said. Peterson did not check Joseph's pulse, blood pressure, or temperature. He did not place a pulse oximeter on Joseph's finger to determine if Joseph was getting enough oxygen.

¶ 14    Peterson testified he is not required to automatically follow a certain protocol based on a dispatch. Instead, he is to react and treat the person based on what he sees and how that person presents to him. He is not supposed to initiate treatment for something he does not see when he is there. Peterson did not see evidence that there was any difficulty breathing. Peterson testified that if a father informs him that his son is having difficulty breathing or has a history of asthma, then under the asthma SOP Peterson would be required to do a pulse oximetry reading, assess and record vital signs and breath sounds, and transport the child. Peterson did none of those things for Joseph.

¶ 15    Howard Franzen testified that he was working for defendant as a firefighter/paramedic on October 31, 2004. He believes that he was the paramedic in charge for the call to Larry Furio's home. He was required to follow the Saint Francis standard operating procedures. The event that lead to the 9-1-1 call was either not breathing or difficulty breathing. The call came to him as a child unconscious and "sounds like asthma." Franzen remembered that Joseph's father did not say anything when they arrived at his home. Larry Furio led Franzen to Joseph's bedroom, the lights came on, and Joseph sat up in bed. Franzen testified Larry Furio asked Joseph if he

was okay and Joseph responded yes. Franzen observed the verbal exchange between Larry and Joseph. Larry Furio told his son he thought Joseph was having an asthma attack. Franzen testified Joseph denied that he was having an asthma attack.

¶ 16    Franzen asked Joseph if he was okay and Joseph said "I want to go back to sleep." Joseph also said something similar to "Yes, I'm fine." Franzen did not ask Joseph any other questions. Larry Furio said something to Franzen similar to "see there, he's fine." Franzen recalled that once it was established that Joseph was okay Franzen told everyone they were leaving. Larry Furio said that he was sorry for the false call, and Franzen responded that if he needed 9-1-1 or if he was in doubt to call them back.

¶ 17    Franzen testified that after "looking at it over time" he feels he did do a primary assessment based on his observations. He did not check the oxygen level of Joseph's blood or check Joseph's vital signs. Franzen testified he assessed Joseph's airway, breathing, and alertness based on the fact that Joseph was talking with his father and answering questions appropriately. Franzen testified he assessed Joseph's circulation by observing the color tone of his skin and that Joseph appeared to be perfusing normally. Franzen testified that the SOP recommends comparing pulses to do a circulation assessment. Franzen testified that he also observed Joseph's pupils and they did not raise any concerns. Franzen observed Joseph to be alert because he responded to stimuli of questions and the light coming on in his room, and Joseph was responsive. Franzen testified that he assessed Joseph to be alert to person, place, and time. Franzen testified that by the end of the 1 a.m. call, his final determination was that Joseph "was somebody in–that was sleeping and was awoken by his father and there was no patient."

¶ 18    Franzen testified to an earlier statement in which he said that Larry Furio said in his presence that he thought his son was having trouble breathing or was not breathing. Franzen testified that if Joseph had actually not been breathing, that would not be a false alarm. Franzen did not ask Larry Furio if Joseph was unresponsive prior to their arrival or what led him to believe Joseph was unresponsive or not breathing. Franzen asked neither of them about an asthma attack and did not know Larry Furio had attempted CPR. Franzen never received any information regarding illegal drug use or CPR being performed before paramedics arrived.

¶ 19    On the date in question there was an SOP for asthma that he would be required to follow if he had information that the patient was not breathing and had asthma. When he arrived at Larry Furio's home, nothing indicated to Franzen that he should begin following the asthma protocol because Joseph's breathing did not appear to be stressed and his color seemed appropriate.

¶ 20    Franzen testified that the SOPs required a primary survey which includes checking circulation. A secondary survey requires a Glasgow Coma Scale, which requires a systolic blood pressure. The primary survey, according to Franzen, is to determine if you have a patient or not. When the primary survey is done, either there is not a patient or there is more to be assessed. The secondary survey is only done under certain circumstances. Franzen testified he did a visual primary assessment.

¶ 21    Plaintiff called Dr. David Tan as an expert witness. Dr. Tan testified to a reasonable degree of medical certainty that Joseph was suffering from an opiate toxidrome from drug ingestion at the time of the first 9-1-1 call. An opiate toxidrome refers to a group of findings, signs, or

symptoms that together suggest a given diagnosis. Dr. Tan testified that if you put several signs and symptoms together, it suggests an overdose of some kind, typically of the opiate family. He also testified that "how the patient presents can often be predicated upon how much of the substance was used, when it was used, how much tolerance they have." Dr. Tan testified to the signs that Joseph was suffering from an overdose when his father dialed 9-1-1 at approximately 1 a.m. Plaintiff asked Dr. Tan's opinion as to "whether[,] if the paramedics had done an initial assessment[,] *** that would have revealed signs, symptoms, and a history of a potentially life-threatening situation; namely, opiate intoxication." Dr. Tan opined that had the paramedics exercised "even a basic management of that scene," they would have gathered information that "would have alerted the paramedic[s] to the fact that there was a medical emergency here that require[d] transport to a hospital." Dr. Tan opined that regardless of why Joseph was transported to the hospital, if he had been transported at 1:06 a.m., Joseph would have survived.

¶ 22 Dr. Tan stated his opinion to a reasonable degree of medical certainty as to what caused Joseph's death. Dr. Tan testified:

> "DR. TAN: More likely than not, Mr. Furio resuscitated [Joseph] enough to the point where he actually was awake when professional rescuers arrived. After they left, however, at some point in time from the time they left to the next morning when he was found dead, essentially, he probably went back into that–lapsed into an opiate-induced coma."

¶ 23 On cross-examination, Dr. Tan confirmed his opinion that Joseph had ingested opiates before the 1 a.m. 9-1-1 call. When asked whether he knew at what time Joseph ingested any opiates, Dr. Tan responded as follows:

> "DR. TAN: Well, what I know is that at the time of his initial presentation, again, based on the 9-1-1 call and what happened, that at 1:06, I can say that he most likely had opiates on board at the time.
>
>        * * *
>
> Q. [Defense attorney:] You do not know at what time he ingested those opiates?
>
> A. No, I do not know exactly what time he took them."

¶ 24 Defendant's counsel asked Dr. Tan about the effect of taking opiates and whether other signs, such as stumbling from his father's car when he picked Joseph up, would be present if Joseph had taken sufficient opiates to stop his breathing at 1:06 a.m. Dr. Tan testified "for example, if he took a short-acting opiate, I don't know that he would last until 1:06, versus a much longer-term opiate, it may have taken an hour, hour and a half for his clinical symptoms to show itself again." Later in defense counsel's cross-examination, the following exchange occurred:

> "Q. [Defense attorney:] So you're not able to pinpoint whether between the 1:06 call and the 9:00 a.m. call whether Joe had ingested any additional drugs?
>
>        * * *

A. [Dr. Tan:] I have no evidence to say either way that he took more drugs after 1:06 a.m. I just know that at the time of the 9-1-1 call at 1:00 a.m., he was under the influence of some intoxicant.

Q. It's hard to put an exact time on what he ingested and when, would you agree?

* * *

A. Correct."

¶ 25    The jury heard testimony from Mark Koziel, who was a battalion chief and medical officer for the City of Park Ridge fire department in October 2004. Koziel's only knowledge of the first 9-1-1 call came from talking to others. Koziel testified that after speaking with Peterson and Franzen, he was not concerned about what they had done at the call in assessing the scene and in assessing the person they were called for, because what they told him sounded reasonable and he trusted their judgments. When asked his opinion as to whether the paramedics assessed the situation as they were trained to do, Koziel testified "apparently not." Koziel testified that the SOP requires a Glasgow Coma Scale on all patients but as far as he knew Franzen and Peterson did not do a Glasgow Coma Scale on Joseph.

¶ 26    Defendant called Dr. Max Koenigsberg, an emergency medical specialist, as a witness. Defendant hired Dr. Koenigsberg to review material and act as a consultant on this case. Dr. Koenigsberg testified that he is familiar with the standard of care applicable to paramedics and that his opinion was that Peterson and Franzen complied with the standard of care for a reasonably well-qualified paramedic because they assessed the scene and determined that the subject of the original call was not having any complaints, was not having any distress, and was not disoriented, and there was no one that was observed to be a patient. Peterson and Franzen made a determination of Joseph's status by observing him and his airway, breathing, and circulation. Dr. Koenigsberg testified that the SOP primary determination is "after you determine there's a patient." Nonetheless, he testified that Peterson and Franzen "determined through their primary survey that there was no evidence that Joey at that point in time needed to be a patient." Dr. Koenigsberg testified that once it is determined "you have a patient by doing your primary assessment," the ABCs, then "you start taking care of the patient, you do a more detailed primary survey and hands-on. You check the pulse, you check the capillary refill and then you proceed with vital signs."

¶ 27    Dr. Koenigsberg also testified that the SOPs contain no requirements that have to be done to determine there is a patient. The general patient assessment stated in the SOP applicable to the paramedics in this case is not the step to take prior to determining there is a patient. The ABCs under the general assessment are stated in a more detailed fashion. He opined, from his review of the materials, that the paramedics were not aware of Larry having attempted CPR. Dr. Koenigsberg testified the paramedics appropriately determined that Joseph was not a patient. Specifically, Dr. Koenigsberg stated: "I think the paramedics practiced within the [standard] of practice and evaluated the scene appropriately, took the information that they had in a timely manner, an appropriate time and determined that Joey was not in need of being a patient based on the information they had at hand."

¶ 28    Larry continued to check on Joseph until approximately 3:15 a.m. before going to sleep. He checked to make sure that Joseph was breathing and that his color was good. Larry did not see

any problems with Joseph before going to sleep. The next morning, he found Joseph unconscious and blue. Larry called 9-1-1 again, and paramedics arrived and transported Joseph to the hospital. Doctors informed Joseph's parents that he was brain dead.

¶ 29    The jury returned a verdict in plaintiff's favor. This appeal followed. On April 5, 2013, the Illinois Governmental Association of Pools (IGAP) filed a brief as *amicus curiae*. IGAP consists of the members of 7 Illinois self-insured intergovernmental risk-pool organizations whose membership totals more that 1,500 municipalities, townships, park districts, school districts, forest preserve districts, community colleges, special recreation districts, and other units of local government. IGAP engages in risk management activities to lessen its members' exposure to liability from claims and litigation.

¶ 30                                    ANALYSIS
¶ 31                           1. Evidentiary Admission
¶ 32    Plaintiff filed a motion *in limine* to declare that a statement in defendant's June 9, 2006 reply brief was a judicial admission that cannot be controverted. The parties argued whether the statement in defendant's reply brief would be admitted as an admission throughout the trial. The trial judge ruled that she would allow plaintiff to present the statement in rebuttal. Defendant's counsel argued that the defense should be allowed to explain the context of the statement in the reply brief and how the statement came to be in the pleadings. The trial judge ruled that plaintiff's counsel would be allowed to read the statement, then the court would ask for any matters in surrebuttal, at which point defense counsel would be permitted to state that the admission just presented to the jury was drafted by the attorneys representing defendant. After the defense rested its case, in front of the jury the trial judge asked counsel for plaintiff if she had anything in rebuttal. Plaintiff's counsel stated as follows:

> "MS. JENSEN [Plaintiff's attorney]: I do, your Honor. I would like to present in evidence a pleading that was filed in court by the Defendant City of Park Ridge in which the following statement was made."

¶ 33    Before reading the statement, the trial court instructed the jury that what it was about to hear was evidence in the case. Plaintiff's counsel read the following statement:

> "In the present case, it is clear that while the City of Park Ridge paramedics responded to the Furio home arriving at 1:11 a.m. and leaving at 1:18 a.m., they provided no medical care of any kind, including evaluation, assessment, diagnosis, treatment, or documentation."

¶ 34    The trial judge asked counsel for defendant if he had anything in surrebuttal and, after the trial court instructed the jury that her statement was also to be treated as evidence, defense counsel made the following statement:

> "MS. JAMES [Defense attorney]: The statement that was just read to you was drafted by the attorneys for the City of Park Ridge and contained in the pleading and filed on behalf of the City entitled 'Reply Memorandum in Support of its Motion to Dismiss Plaintiff's First Amended Complaint at Law.' "

¶ 35    The trial judge then instructed the jury that the parties would proceed with closing arguments. Defendant argues that the trial court deprived it of a fair trial by allowing plaintiff to read to the jury, as an evidentiary admission, the statement in defendant's reply brief in support of defendant's motion to dismiss, which defendant had filed pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2006)), just before the parties' closing arguments. We review the court's decision concerning the admissibility of evidence, including admissions, for an abuse of discretion. *CFC Investment, L.L.C. v. McLean*, 387 Ill. App. 3d 520, 530 (2008) (applying abuse of discretion standard to trial court's order barring use of statement during deposition as an admission).

¶ 36    "Any oral or written out-of-court statement by a party to the action *** which tends to establish or disprove any material fact in a case is an admission and is competent evidence against that party in the action." (Internal quotation marks omitted.) *CFC Investment, L.L.C.*, 387 Ill. App. 3d at 529. "Judicial admissions are formal admissions in the pleadings that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. [Citation.] For a statement to constitute a judicial admission, it must be clear, unequivocal, and uniquely within the party's personal knowledge. [Citation.] The statement must also be an intentional statement which relates to concrete facts and not an inference or unclear summary." *Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011). Evidentiary admissions can be controverted or explained by the party, while judicial admissions cannot be controverted or explained. *Pryor v. American Central Transport, Inc.*, 260 Ill. App. 3d 76, 85 (1994).

¶ 37    Defendant and *amicus curiae* argue that the statement in defendant's reply brief is not admissible as an admission because defendant was required to admit plaintiff's well-pled allegations as true for purposes of its motion to dismiss pursuant to section 2-619 of the Code. *Bjork v. O'Meara*, 2013 IL 114044, ¶ 21 ("A section 2-619 motion admits as true all well-pleaded facts, as well as all reasonable inferences that may arise therefrom."). *Amicus curiae* argues that the admission misinformed the jury as to defendant's position on the facts of the case because the statement in the reply brief was defendant's position on the statutory immunity defenses only, "which Defendant Park Ridge had properly raised as part of a § 2-619 motion to dismiss directed to the Complaint."

¶ 38    Defendant cites *Bargman v. Economics Laboratory, Inc.*, 181 Ill. App. 3d 1023, 1032 (1989), in which the court held that the trial court properly prohibited plaintiff's introduction into evidence, as admissions, certain allegations contained in the defendant's third-party complaint. The *Bargman* court found that "[a] party wishing to make alternative or contingent claims should not be placed in the perilous situation of either foregoing one claim or having one claim used against another as an admission." (Internal quotation marks omitted.) *Bargman*, 181 Ill. App. 3d at 1033. Defendant and *amicus curiae* argue municipal defendants should not be placed in the "perilous situation" of asserting immunities in motions to dismiss and having their pleadings used against them as admissions.

¶ 39    The *Bargman* court found that the third-party complaint clearly stated that the defendant denied liability to the plaintiff, but if it were found liable, then the third-party was liable. *Bargman*, 181 Ill. App. 3d at 1033. The defendant argued that "where allegations are not

pleaded in the alternative or hypothetically, they may be used as admissions against the pleader." *Bargman*, 181 Ill. App. 3d at 1032 (citing *Associated Claims Service, Inc. v. Rinella & Rinella*, 79 Ill. App. 3d 1023 (1979)). The *Bargman* court found that the third-party complaint "is pleaded alternatively when read as a whole." *Bargman*, 181 Ill. App. 3d at 1033. Moreover, the court noted that " 'we do not believe there is some magic in labeling inconsistent pleadings "alternative" or "hypothetical" which invokes the principal underlying the alternative pleading rule.' " *Bargman*, 181 Ill. App. 3d at 1033 (quoting *Tuttle v. Fruehauf Division of Fruehauf Corp.*, 122 Ill. App. 3d 835, 842 (1984)). The *Tuttle* court similarly held that the trial court properly prevented the plaintiff from referring to the allegations in the defendant's third-party complaint because Illinois law does not allow "alternative, unverified pleadings to be used as admissions against the pleader." *Tuttle*, 122 Ill. App. 3d at 841. The *Tuttle* court reached this conclusion despite the fact that not all of the allegations were phrased hypothetically or in the alternative because, it found, "regardless of the phrasing of the factual allegations in [the] defendant's third-party complaint, the complaint is an alternative, unverified pleading, and the allegations in the complaint are not admissions." *Id*. at 842. The court also noted that one allegation, as phrased, plainly did not admit anything. *Id*.

¶ 40    *Amicus curiae* also argues that the trial court's ruling is contrary to section 2-619(c) as written. Section 2-619(c) of the Code provides, in pertinent part, as follows: "If a material and genuine disputed question of fact is raised the court *** may deny the motion without prejudice to the right to raise the subject matter of the motion by answer and shall so deny it if the action is one in which a party is entitled to a trial by jury and a jury demand has been filed by the opposite party in apt time." 735 ILCS 5/2-619(c) (West 2004). *Amicus curiae* argues that because section 2-619(c) permits a defendant to raise the same grounds in its motion to dismiss by answer, section 2-619 makes clear that the admission that the facts pled in the complaint are true is for the limited purpose of ruling on the motion to dismiss, and does not prejudice the defendant from denying such facts are true in an answer. *Amicus curiae* argues that the trial court's ruling effectively rewrites section 2-619(c) of the Code to include a provision that states a defendant's acceptance of the well-pled allegations in a complaint as true for purposes of a motion under section 2-619 shall constitute an evidentiary admission which may be presented at trial.

¶ 41    Plaintiff responds defendant went beyond admitting the truth of the allegations in her complaint for purposes of its motion to dismiss. Plaintiff argues defendant took an affirmative position in its reply brief and admitted facts that plaintiff did not plead in her first amended complaint. Plaintiff cites *Lichon v. Aceto Chemical Co.*, 182 Ill. App. 3d 672 (1989), in which the court held that a statement in the defendant's reply memorandum in support of its motion to dismiss was a binding judicial admission. *Lichon*, 182 Ill. App. 3d at 679-80 (citing *Trapkus v. Edstrom's, Inc.*, 140 Ill. App. 3d 720 (1986)). The court also found that an assertion in a motion to dismiss was a binding judicial admission in *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 513 (1995).

¶ 42    Defendant's reply brief in support of its motion to dismiss states that the basis of defendant's motion is that it is immune from liability for a failure to evaluate, assess, or diagnose Joseph. Our supreme court construed the complaint to allege that "the emergency

responders arrived at the residence and then left without evaluating or giving necessary treatment to [plaintiff's] unresponsive minor son." *Abruzzo*, 231 Ill. 2d at 331. The relevant allegations in the first amended complaint regarding defendant's conduct on the night in question are as follows:

> "7. On October 31, 2004, the EMTs, paramedics, and fire fighters did not provide advanced life support to Joseph Furio.
>
> * * *
>
> 11. [T]he EMTs and/or paramedics treating Joseph Furio knew *** that a child, who was unresponsive, required transport to a hospital.
>
> 12. [T]he EMTs *** should have evaluated and assessed Joseph Furio and transported Joseph Furio to a hospital ***.
>
> * * *
>
> 17. [D]efendant *** behaved with wilful and wanton conduct *** in one or more of the following respects:
>
> > (a) *** never evaluated or assessed the patient;
> > (b) *** never transported the patient to a hospital;
> > (c) *** failed to evaluate or assess Joseph Furio, a nonresponsive patient;
> > (d) *** failed to transport Joseph Furio."

¶ 43  We agree with defendant and *amicus curiae* that no defendant should be placed in the position of only being able to assert an immunity defense if the defendant is willing to have its agreement with the plaintiff's factual allegations for purposes of a motion to dismiss admitted as evidence at a subsequent trial. We do not agree, however, that defendant merely accepted plaintiff's factual allegations as true for purposes of its motion to dismiss. The pleading at issue must be construed as a whole to determine whether the statement was made simply for purposes of the motion to dismiss or is in fact an admission of fact. See *Bargman*, 181 Ill. App. 3d at 1033. Reading defendant's reply brief as a whole, we find that the defendant's reply goes beyond accepting the allegations in plaintiff's complaint as true for purposes of its motion to dismiss and that defendant's reply brief does admit the facts that were read to the jury.

¶ 44  Defendant's reply brief argued this case is distinguishable from *Antonacci v. City of Chicago*, 335 Ill. App. 3d 22, 29 (2002), which required defendant to assert facts rather than limit itself to accepting the allegations of the complaint as true for purposes of its motion to dismiss. The issue in *Antonacci* was "the extent of statutory immunity given the City of Chicago (the City) where its paramedics allegedly failed to perform an EKG or defibrillation on a patient they had diagnosed as having had a heart attack." *Antonacci*, 335 Ill. App. 3d at 23. The defendant in that case filed a motion to dismiss pursuant to section 2-619 on the grounds of immunity under the Tort Immunity Act. *Id*. at 25-26. The court found that under the Tort Immunity Act, if governmental medical personnel do not examine the patient, they are immunized; if they fail to make a diagnosis, or fail to prescribe treatment, or if they make an incorrect diagnosis, they are immunized. *Id*. at 27. But negligent or wrongful prescribing of treatment that results in harm is not immunized, nor is there immunity for harm caused by a negligent or wrongful act or omission in administering the prescribed treatment after a correct diagnosis. *Antonacci*, 335 Ill. App. 3d at 27. Immunity in *Antonacci* would turn on whether the

- 12 -

paramedics had "diagnosed" the deceased and begun to "treat" him, or whether the allegations were actually that the paramedics failed to diagnose the decedent. *Antonacci*, 335 Ill. App. 3d at 28. The *Antonacci* court found enough factual allegations in the plaintiff's complaint and physician's report to say the motion to dismiss should not have been granted, but also found that "[t]here may or may not have been a 'diagnosis' and prescribed 'treatment' that would exclude tort immunity." *Antonacci*, 335 Ill. App. 3d at 31. The court held that "principled resolution of the immunity issue" in that case required a better record. *Antonacci*, 335 Ill. App. 3d at 31. The court did not rule on the merits of the motion to dismiss and remanded the case, where it assumed there would be "more evidence of when and how diagnosis, prescription of treatment, and/or treatment were performed or not performed." *Id*.

¶ 45    In this case, based on the holding in *Antonacci*, defendant could have argued, based just on the allegations in the first amended complaint, that defendant did not "diagnose" Joseph and, thus, no treatment was prescribed, and defendant did not administer any treatment, and, therefore, defendant has absolute immunity. *Antonacci*, 335 Ill. App. 3d at 30 (Tort Immunity Act applies because plaintiff's complaint alleged failure to perform examinations leading to failure to diagnose condition, which in turn proximately caused death (citing *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 512 (2000))). In its reply brief, defendant did in fact argue that there was no diagnosis, no physical examination, and no treatment provided. Defendant argued that "[t]he repeated assertions in Plaintiff's First Amended Complaint, Plaintiff's Response Memorandum and Plaintiff's Physician's Report that Defendants [*sic*] 'failed to provide any emergency medical care' is finally what distinguishes this case from the appellate court decision in *Antonacci*."

¶ 46    However, defendant then cited that portion of the *Antonacci* opinion remanding for "more evidence of when and how diagnosis, prescription of treatment, and/or treatment were performed or not performed" (*Antonacci*, 335 Ill. App. 3d at 31), and argued that "[u]nlike in *Antonacci*, none of these questions need to be addressed here, because the record in this case is clear. The Defendants responded to the 1:06 a.m. 9-1-1 call and provided no emergency medical care of any kind." Construing defendant's reply brief as a whole results in finding that, in addition to accepting plaintiff's allegations as true in support of its immunity defense, defendant asserted matters of fact unnecessary and unrelated to its position on its motion to dismiss. Specifically, defendant asserted that "the record in this case is clear" and defendant "provided no emergency medical care of any kind." By making these assertions, defendant went beyond merely accepting the allegations in plaintiff's first amended complaint as true for purposes of arguing it was entitled to absolute immunity, and affirmatively asserted that there was, in fact, no medical care of any kind in this case.

¶ 47    *Amicus curiae*'s argument that section 2-619(c) permits a defendant to raise the same grounds in its motion to dismiss by answer actually supports our conclusion that this additional allegation constitutes an admission of fact, rather than an acceptance of plaintiff's allegations. If the trial court in this case had denied defendant's motion to dismiss, defendant could have raised its immunity defense (had our supreme court ruled that the Tort Immunity Act applied) by answer. Immunity under the Tort Immunity Act is an affirmative defense, and defendant would have had the burden to prove its right to immunity, including the facts on which its

- 13 -

alleged immunity is based. *Albers v. Breen*, 346 Ill. App. 3d 799, 806 (2004) ("Because governmental immunity is an affirmative defense, the defendant bears the burden of properly proving that the immunity applies to defeat the plaintiff's claim. [Citation.] The defense must be apparent on the face of the complaint or else supported by affidavits or other evidentiary materials."). But defendant argued that proceeding to a trial of those facts was not necessary because the fact that its paramedics provided no medical services was clear. Defendant believed at that time this would entitle it to absolute immunity. That our supreme court determined that defendant was wrong about the law that applied does not change defendant's assertion about the facts.

¶ 48        Defendant argued that its answer, filed after our supreme court reversed the granting of its motion to dismiss, superseded its motion to dismiss (and reply brief). *Amicus curiae* argued that this answer contains defendant's "real position" on the facts it is alleged to have admitted. Defendant's answer does not allege that its paramedics did perform a visual evaluation or assessment. Defendant's answer admitted that emergency medical technicians (EMTs), paramedics, and fire fighters did not provide advanced life support (paragraph 7), admitted that the emergency response team left without transporting Joseph (paragraph 15), and denied that it responded to a request for emergency medical service for an unresponsive patient receiving CPR with a history of drug abuse and: never evaluated or assessed the patient, never transported the patient to a hospital, failed to evaluate or assess Joseph, failed to transport Joseph, failed to initiate advanced life support, and failed to assess airway, breathing, and circulation (paragraph 17). Each of defendant's affirmative defenses states that plaintiff has pled that defendant failed to examine, diagnose, and treat Joseph, and that defendant has denied all material allegations of wilful and wanton conduct. *Amicus curiae* does not assert that defendant took the position in its answer that it did perform a visual assessment, but only asserts that the answer explains why defendant "did not need to 'evaluate, assess, diagnose, treat or document' emergency medical care for Joey Furio." There is nothing in defendant's answer that is inconsistent with the admission that the record is clear that defendant's paramedics provided no medical care of any kind.

¶ 49        Defendant's statement in its reply brief was an unequivocal assertion of fact that went beyond the pleadings and, therefore, constitutes an admission. Defendant repeated that assertion to this court on appeal. *Abruzzo*, 374 Ill. App. 3d at 749. Defendant argued that there was no conflict between the Tort Immunity Act and the EMS Act because the former applies to "pretreatment activities while the EMS Act only provides immunity once treatment has begun." *Abruzzo*, 374 Ill. App. 3d at 749. Defendant argued to this court that "only the immunities in *** the Tort Immunity Act apply in this case because *absolutely no treatment was rendered to Joseph*." (Emphasis added.) *Abruzzo*, 374 Ill. App. 3d at 749. In *Abruzzo I*, defendant argued *Antonacci* was distinguishable. The *Antonacci* court had "decided to remand the case without ruling on the *** motion to dismiss, finding that the record was inadequate to determine whether the paramedics had reached a correct diagnosis which would then subject the [defendant] to liability for subsequent negligent treatment." *Abruzzo*, 374 Ill. App. 3d at 751 (citing *Antonacci*, 335 Ill. App. 3d at 31). Defendant contended to this court that "unlike in *Antonacci, it is absolutely clear* that the EMTs and paramedics who responded to Lawrence's

911 call *provided absolutely no treatment for Joseph* and did not reach a diagnosis." (Emphases added.) *Abruzzo*, 374 Ill. App. 3d at 751.

¶ 50    The admission did not give the jury a false picture of defendant's position on whether or not it was guilty of wilful and wanton conduct. The statement read to the jury was not a legal conclusion because it did not admit that defendant's paramedics' conduct was wilful or wanton. The admission only stated defendant's position on what its paramedics actually did or did not do. Therefore, *Pritza v. Village of Lansing*, 405 Ill. App. 3d 634 (2010), is inapposite. In that case, the court held that "the pleader is not bound by admissions regarding conclusions of law, since the trial court must determine the legal effect of the facts adduced." *Pritza*, 405 Ill. App. 3d at 645. In this case, we are not dealing with a purported conclusion of law in defendant's pleading. Rather, defendant's paramedics' conduct or lack thereof is a question of fact. It remained for the jury to decide whether what the paramedics did or did not do was wilful and wanton conduct. See *Pritza*, 405 Ill. App. 3d at 645 ("our resolution of the instant case turns on whether defendants were insurers *ab initio*, which is also a question of law not resolved by any factual admission").

¶ 51    We do not hold that accepting the allegations of the complaint as true in pleadings on a motion to dismiss admits those allegations for purposes of trial. Our holding does not convert defendant's immunity defense into an admission of liability. Our holding is limited to the facts of this case, where defendant affirmatively stated its position on the facts of the case, rather than limiting itself to the allegations in the complaint. Our holding will not have a chilling effect on similar motions in the future. We cannot say every statement of fact in a pleading on a motion which must accept certain facts as true is made only for purposes of the motion and cannot constitute an admission. See *Prentice*, 271 Ill. App. 3d at 513 (finding judicial admission based on unequivocal assertion in motion to dismiss and reply memorandum in support of motion to dismiss regarding whether a contract existed in a breach of contract case). In this case, defendant went beyond stating the facts as pled in the complaint in support of its motion to dismiss. Defendant made affirmative statements of fact in its reply brief regarding "the record in this case" and its paramedics' conduct to avoid litigating the issue of its immunity in the event the court determined the facts alleged *in the complaint* proved insufficient on their own to support the motion.

¶ 52    The passage in defendant's reply brief that we find contains the affirmative statement of fact is not the same passage actually read to the jury. That fact does not change the outcome, however, because the pleading is to be construed as a whole to determine whether it contains an admission of fact, and the substance of the admission transmitted to the jury would have been no different had plaintiff been allowed to read the passage which constitutes the actual admission.

¶ 53    The timing of the reading of defendant's admission did not deny defendant a fair trial. Defendant argues that the timing of the reading of the admission exacerbated the prejudice to defendant, undermining the credibility of its witnesses and its attorneys. Even admissible evidence may be excluded "if the prejudicial effect of the evidence substantially outweighs its probative value. [Citation.] Prejudice is undue tendency to suggest a decision on an improper basis." (Internal quotation marks omitted.) *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758,

¶ 20. "It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide the weight to be given to the witnesses' testimony." *Serrano*, 406 Ill. App. 3d at 910. The only basis defendant suggests on which the jury may have improperly decided the case is the jury's belief that defendant changed its story to suit its audience. Defendant's assertion is pure speculation as to the improper effect of the evidence on the jury.

¶ 54       Regardless, defendant did not suffer unfair prejudice from reading the admission to the jury prior to closing arguments. Of note on this issue is Franzen's response to the specific question "Did you perform an assessment?" to which he answered: "The best I can tell you is I said observed [in a deposition]–assisting in primary–I don't know. I observed all these things, so after looking at it over time I feel like I did do a primary assessment by my observations found at the scene." Franzen's testimony implies hindsight in forming his belief, which the jury could construe as a change in position on the subject matter of defendant's admission. Plaintiff also impeached Peterson with his deposition testimony in which he was asked "You made a determination not to provide medical care or assistance to Joey Furio, correct?" to which he responded at the deposition "Yes," but at trial he testified that was not correct. At Peterson's deposition, he testified that he did not assess Joseph. At trial, he testified that he "did a visual assessment while I was looking at the child."

¶ 55       The jury heard conflicting evidence throughout trial as to whether defendant's paramedics provided medical care of any kind to Joseph in the early hours of October 31, 2004, "including evaluation, assessment, diagnosis, treatment, or documentation." The jury heard testimony from the paramedics, their battalion chief, and two experts as to the care, if any, provided to Joseph. Defendant's consistency in its explanation of the events on the night at issue, or lack thereof, was already before the jury before the trial court admitted the statement in defendant's reply brief. The trial court permitted defendant to explain the admission to the jury. Defense counsel informed the jury that the statement it heard was drafted by the attorneys for the City of Park Ridge. "We are not at liberty to disturb a verdict of the jury in the absence of conviction on the part of this court that the verdict is against the manifest weight of the evidence. [Citation.] The object of review by this court is not to determine whether the record is completely free of error, but to ascertain whether upon the trial there has been such error as might prejudice the rights of a party." *Kosowski v. McDonald Elevator Co.*, 33 Ill. App. 2d 386, 396-97 (1962). Under the facts of this case, the claimed error of the timing of the reading of the admission, if it were error, would not warrant a new trial.

¶ 56       The trial court properly admitted the admission and defendant was not prejudiced. Nor can we say that our ruling will have a chilling effect on similar motions. Our judgment is based on the particular facts of this case. Accordingly, we hold that the trial court did not abuse its discretion in admitting the statement as evidence. *McLean*, 387 Ill. App. 3d at 529.

¶ 57                            2. Special Interrogatories

¶ 58       Defendant's next argument is that this cause must be remanded for a new trial because the trial court erred by refusing to submit two proposed special interrogatories to the jury.

"Special interrogatories are governed by section 2-1108 of the Code of Civil Procedure [citation]:

'Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing.'

Special interrogatories are meant to 'test[ ] the general verdict against the jury's determination as to one or more specific issues of ultimate fact.' [Citation.] Under section 2-1108, an answer to a special interrogatory controls the judgment when it is inconsistent with the general verdict:

***

We review *de novo* as a question of law a trial court's decision on whether to give a special interrogatory that has been requested by a party. [Citations.]" *Goranowski v. Northeast Illinois Regional Commuter R.R. Corp.*, 2013 IL App (1st) 121050, ¶ 4.

¶ 59                                    A. Proximate Cause Special Interrogatory

¶ 60        Defendant claims that it was entitled to a special interrogatory to test a jury verdict against it to determine if the presence of opiates in Joey's bloodstream was the "sole proximate cause" of his death. Defendant notes that the trial court instructed the jury that its verdict should be for the defendant if the jury decides "that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant." Illinois Pattern Jury Instructions, Civil, No. 12.05 (3d ed. 1994). Defendant therefore argues that its special interrogatory on this subject should have been given. We disagree.

¶ 61        In our view, the trial court properly refused defendant's sole proximate cause interrogatory, for several reasons. First and foremost, defendant did not claim at trial that the presence of opiates in Joey's bloodstream was the *sole*, or *only*, cause of his death. Specifically, defendant filed an affirmative defense alleging that Joey's father was contributorily negligent in failing to provide a complete medical history, which would have informed them of Joey's use of narcotics. As a result, defendant claims that its paramedics would have treated Joey and transported him to the hospital had they been properly informed by his father of Joey's history of drug consumption. Thus, defendant claimed that the death was caused by Joey's consumption of narcotics and/or his father's contributory negligence. Accordingly, defendant's position at trial, which identified two causes of Joey's death, does not satisfy any interpretation of a "sole proximate cause" argument.

¶ 62        Our supreme court had an opportunity to examine this very issue in *Holton v. Memorial Hospital*, 176 Ill. 2d 95 (1997). In *Holton*, the defendant hospital in a medical malpractice trial sought to prove that there was no medical negligence involved in causing the plaintiff's injuries, which included paraplegia and related medical problems, occasioned as a result of treatment for what was mistakenly believed to be a cancerous tumor. *Id*. at 99-104. In addition to that claim, the defendant sought to blame the damages on the conduct of several physicians

- 17 -

who had settled claims against them and were not party to the action at trial. *Id*. at 99, 132-34. The supreme court brushed this argument aside thusly:

> "A defendant is not automatically entitled to a sole proximate cause instruction wherever there is evidence that there may have been more than one, or concurrent, causes of an injury or where more than one person may have been negligent. Instead, a sole proximate cause instruction is not appropriate unless there is evidence that the *sole* proximate cause (not 'a' proximate cause) of a plaintiff's injury is conduct of another person or condition." (Emphasis in original.) *Id.* at 134.

¶ 63 Based on this precedent, it is clear that the facts of this case did not warrant the giving of a sole proximate cause instruction. Ergo, defendant's sole proximate cause special interrogatory was inappropriate and the trial court rightly refused to tender the interrogatory to the jury.

¶ 64                                   B. Wilful and Wanton Interrogatory

¶ 65 Defendant also argues that the trial court committed reversible error when it refused to give its second special interrogatory, which read as follows: "Was the City of Park Ridge wilful and wanton showing utter indifference to or conscious disregard for Joseph Furio in its response to the 1:06 a.m. 9-1-1 call?" Defendant argues that the trial court should have given the interrogatory because the question challenged the ultimate issue of fact of whether Park Ridge's conduct was wilful and wanton. Defendant argues, even though it has no burden to prove jury confusion to support its request for a special interrogatory under section 2-1108 of the Code, the jury may have confused the negligence standard with the standard for wilful and wanton conduct, because several instructions referenced the negligence standard in connection with defendant's claim of contributory negligence against Larry Furio.

¶ 66 Plaintiff responds that "[b]y phrasing the special interrogatory as they did, Defendant focused the jury's attention on the response to the call rather than on the failure to assess or transport after the paramedics responded." Because plaintiff asserted that defendant was wilful and wanton in its conduct after arriving at the Furio home, plaintiff argues that an interrogatory asking about defendant's "response" does not cover plaintiff's allegations or the issues upon which the jury was called to render a decision and, therefore, is not in proper form. See *Simmons v. Garces*, 198 Ill. 2d 541, 555-56 (2002) ("A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. [Citations.] *** If a special interrogatory does not cover all the issues submitted to the jury and a 'reasonable hypothesis' exists that allows the special finding to be construed consistently with the general verdict, they are not 'absolutely irreconcilable' and the special finding will not control."); *Jablonski v. Ford Motor Co.*, 398 Ill. App. 3d 222, 274 (2010) ("in order to be in proper form, the interrogatory must consist of a single question that, standing alone, would control the verdict on all the theories of negligence"), *rev'd on other grounds*, *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 128 ("In light of our holding, we need not address *** whether the court erred in rejecting Ford's special interrogatories.").

¶ 67     The trial court properly refuses a special interrogatory where a reasonable hypotheses exists that an answer to the interrogatory would not be inconsistent with a general verdict. *Jablonski*, 398 Ill. App. 3d at 276. The determination of whether a special interrogatory is in proper form must be made in the context of the parties' claims and the instructions given by the court. *Id*. "Special interrogatories are to be read in the context of the court's other instructions, which set forth the claims of the parties, to determine how the interrogatories might be interpreted by the jury and whether the jury might be confused." *Id*. (citing *Simmons*, 198 Ill. 2d at 564). Special interrogatories require careful scrutiny to be certain that the jury could not interpret an interrogatory so that an answer would not be " 'absolutely irreconcilable' with a contrary general verdict." *Id.* at 274.

¶ 68     In this case, the trial court instructed the jury, in part, as follows:

> "The plaintiff's complaint consists of two counts: The issues to be decided by you under Count I of the complaint are as follows:
>
> The Plaintiff on behalf of Joseph Furio's next of kin claim they sustained damages and that the defendant was wilful and wanton in one or more of the following respects:
>
> 1. Defendant failed to assess or evaluate Joseph Furio on October 31, 2004 at 1:06 a.m.; or
>
> 2. Defendant failed to transport Joseph Furio to the hospital on October 31, 2004 at 1:06 a.m.
>
> The plaintiff further claims that one or more of the foregoing was a proximate cause of Joseph Furio's death."

¶ 69     The instruction as to count II stated the same claims on behalf of the estate of Joseph Furio. A later instruction informed the jury that plaintiff had the burden to prove that "defendant acted or failed to act in *one of the ways* claimed by the plaintiff as stated to you in these instructions and that in so acting, or failing to act, the defendant was wilful and wanton." (Emphasis added.)

¶ 70     "If a special interrogatory covers only one of the plaintiff's two theories of negligence, it is not in proper form since an answer contrary to a general verdict would not be inconsistent with the remaining theory of negligence." *Jablonski*, 398 Ill. App. 3d at 274. In *Jablonski*, each of the special interrogatories submitted by the defendant was designed to test the jury's verdict on either the issue of negligence or the issue of wilful and wanton conduct. *Id*. The court held that the trial court correctly refused to submit the interrogatories to the jury in part because the interrogatories were "too vague and ambiguous in that they do not explicitly cover all the plaintiffs' allegations of negligence." *Id*. at 275. The interrogatory asked, "Did [the defendant] fail to use ordinary care for the safety of [the plaintiffs]?" (Internal quotation marks omitted.) *Id*. The *Jablonski* court found that "the question that needed to be asked was, 'Did [the defendant] fail to use ordinary care for the safety of [the plaintiffs] *in any of the ways claimed by [the plaintiffs]*?' " (Emphasis in original.) *Id*. The court held that "[t]he interrogatories *** are simply not sufficiently specific in this case to cover all the allegations of negligence. Consequently, a reasonable hypothesis exists that an answer to the interrogatories would not be inconsistent with a general verdict. Accordingly, the trial court was correct in refusing [the] special interrogatories." *Id*. at 276.

- 19 -

¶ 71 "Particular attention must be given to the wording of a special interrogatory seeking to test a general verdict on the issue of negligence when the plaintiff has alleged multiple theories of negligence." *Jablonski*, 398 Ill. App. 3d at 273-74. In this case, as in *Jablonski*, the trial court instructed the jury to find in favor of plaintiff if plaintiff proved defendant was "guilty of wilful and wanton conduct 'in one of the ways' claimed by the plaintiff[ ]." *Id.* at 274. The expression "response" in defendant's proposed special interrogatory could be understood by the jury to include less than all the theories of wilful and wanton conduct asserted by plaintiff. Therefore, the interrogatory was not in proper form and appropriately was not given. *Id.* We do not believe, in the context of all of the instructions, that the jury would have believed that "response" in the special interrogatory referred to defendant's response *time*. Nonetheless, the jury could have answered defendant's proposed special interrogatory "no" on the question of whether defendant was wilful and wanton in failing to, for example, assess or evaluate Joseph, even though it had found that defendant was wilful and wanton in failing to transport Joseph to the hospital. We note that such findings by the jury are not mutually exclusive based on the testimony of plaintiff's expert. Dr. Tan testified that had the paramedics simply learned "that the events leading up to the 911 call included his father doing mouth-to-mouth and CPR," "[t]hat alone would have alerted the paramedic to the fact that there was a medical emergency here that requires transport to a hospital." Plaintiff's expert also opined that regardless of the *reason* Joseph was taken to the hospital, had he been, he would have survived.

¶ 72 A reasonable hypothesis exists that an answer to the interrogatory would not be inconsistent with a general verdict. Accordingly, the trial court was correct in refusing the wilful and wanton special interrogatory.

¶ 73                    3. Judgment Notwithstanding the Verdict

¶ 74 Defendant's posttrial motion argued that defendant is entitled to a judgment notwithstanding the verdict (judgment *n.o.v.*) because the conduct of the paramedics was not wilful and wanton and, therefore, defendant is immune from liability. Defendant argues the trial court should have granted judgment *n.o.v.* in its favor because the jury's finding that its paramedics acted wilfully and wantonly under the EMS Act is against the manifest weight of the evidence; therefore, it is entitled to immunity. Defendant argues that the paramedics observed an oriented Joseph speaking coherently and not having an asthma attack. Defendant argues the evidence does not support finding that it was wilful and wanton or that the paramedics recklessly or carelessly failed to discover impending danger. *Amicus curiae* also argue that the evidence was not sufficient to present the question of whether defendant's paramedics' conduct was wilful and wanton to the jury. *Amicus curiae* argue that the paramedics did not have sufficient knowledge to have acted wilfully or wantonly.

> "[B]oth the legislature and the supreme court have defined reckless wilful and wanton conduct as conduct committed with 'utter indifference' to or 'conscious disregard' for the safety of others. [Citations.] The supreme court has also described the required mental state as a 'reckless disregard' for the safety of others. [Citation.] Further, ill will is not a necessary element of a wanton act [*i.e.*, reckless wilful and wanton conduct]. To constitute an act wanton, the party doing the act or failing to act must be conscious of

- 20 -

his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury." (Internal quotation marks omitted.) *Kirwan v. Lincolnshire-Riverwoods Fire Protection District*, 349 Ill. App. 3d 150, 155 (2004).

¶ 75 "A trial court's ruling on a motion for judgment notwithstanding the verdict is subject to a *de novo* standard of review. [Citation.] A motion for judgment notwithstanding the verdict should only be granted in those limited cases where all of the evidence and the inferences there from, viewed in the light most favorable to the nonmoving party, so overwhelmingly favor the movant that no contrary verdict based on that evidence could ever stand." *Thornton v. Garcini*, 382 Ill. App. 3d 813, 817 (2008). "In other words, a motion for judgment *n.o.v.* presents a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case. [Citation.]" (Internal quotation marks omitted.) *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37.

¶ 76 We do not find that there was a "total failure or lack of evidence to prove" that defendant's paramedics' conduct was wilful and wanton. "It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide the weight to be given to the witnesses' testimony." *Serrano*, 406 Ill. App. 3d at 910. "When ruling upon *** a motion [for judgment *n.o.v.*], the court does not weigh the evidence or make determinations of credibility and must not substitute its judgment for that of the jury merely because there are other inferences or conclusions that the jury could have drawn or because there are other results that the court believes are more reasonable." *Thornton*, 382 Ill. App. 3d at 817.

¶ 77 The trial court instructed the jury that wilful and wanton conduct is "a course of action which shows an utter indifference to or conscious disregard for the safety of others" and that "[i]t was the duty of the defendant *** to refrain from wilful and wanton conduct which would endanger the safety of the decedent." Despite defendant's paramedics' testimony that Joseph was not a patient in need of further evaluation or treatment, the jury heard sufficient evidence from which it could reasonably conclude that the paramedics' conduct showed an utter indifference to or conscious disregard for Joseph's safety. *Amicus curiae* argue that the "threshold to wilful and wanton conduct is knowledge, without which there never can be wilful and wanton conduct." The jury heard evidence from which it could reasonably conclude that despite the fact Joseph was able to speak to his father and did not appear to be suffering an asthma attack, defendant's paramedics had sufficient knowledge such that their failure to act differently was both deliberate and in utter indifference to or in conscious disregard of Joseph's safety.

¶ 78 Dr. Koenigsberg testified that if paramedics know that CPR had to be performed to get someone to wake up, that would require them to recognize him as a patient and have him evaluated at the hospital. If paramedics knew Joseph was making gurgling noises, they should have done an assessment to evaluate his airway, more than just observation. If paramedics knew of the use of illegal or prescription drugs, that would require the paramedics to treat him

as a patient and transport him to the hospital. Dr. Koenigsberg discounted Koziel's report, which contained statements that the paramedics told Koziel the next day that the patient's father met them at the door and said that his son had a history of asthma and was not breathing, because that is not what any of the other witnesses–the paramedics and police officers on the scene–described. But, Koenigsberg testified that if Larry Furio did, as Larry testified in his deposition, say words similar to "I don't know if it's the drugs, the prescriptions or the asthma" as he was walking the paramedics back to his son's room, then that would alert the paramedics to Joseph's being a patient requiring some further query and examination. Koenigsberg testified that if, when Joseph sat up, he said "It's these pills, Dad, they make me sleepy," that would require the paramedics to consider Joseph a patient and to do a patient assessment.

¶ 79    Plaintiff's expert Guy Haskell testified that, based on that statement by Joseph alone, "that would be the point that it will be determined definitely that this patient needs to be transported to the hospital. Because if there's any indication that medication the patient may have taken may have caused him to be sleepy, the worst thing you can do is leave a patient unseen in that situation because they probably become [*sic*] sleepy again. And if somebody takes enough of something, they can sleep to the point where they're not breathing. And in fact that's what eventually occurred here."

¶ 80    Larry testified he told paramedics "I don't know what's wrong with him, I just know he stopped breathing." Larry Furio testified that when paramedics arrived and he was taking them to Joseph's room, he told them he did not know what was wrong with his son, he did not know if it was his asthma or medications he was on, or drugs. The jury also heard evidence from which it could infer that the paramedics knew Larry Furio had attempted CPR.

¶ 81    Koziel testified that a reasonably well-trained paramedic arriving at the scene of a call for a child who was unconscious but had regained consciousness would check the child's pulse and take a Glasgow Coma Scale. Koziel also testified that in his judgment as a reasonably trained paramedic responding to a report of a 15-year-old, unconscious and not breathing, who was conscious when he arrived, he would ask more than one question, would want to know what happened before he arrived, would want to take vitals, and possibly might want to determine the oxygen level in his blood. Koziel agreed that a well-trained paramedic who learned of a history of asthma would want to determine what medications a child patient was taking, that it would be important to determine how long a patient had not been breathing, and how long a patient had been unconscious, even if the patient had regained consciousness by the time the paramedic arrived on the scene. Koziel agreed that when a paramedic is called to a scene because a patient was unconscious and not breathing, but now the patient is groggy, that patient would require "some additional assessment." Koziel testified that based on his investigation into the response to the first 9-1-1 call, Peterson did not perform any additional assessment.

¶ 82    Defendant argues that absent knowledge of Joseph's alleged ingestion of cocaine and opiates, the paramedics could not be guilty of wilful and wanton conduct. *Amicus curiae* argue that with no information about Joseph's possible ingestion of drugs, the paramedics could not possibly have foreseen Joseph's death due to an overdose. Both cite *Choice v. YMCA of McHenry County*, 2012 IL App (1st) 102877, in support of the proposition that there can be no wilful and wanton conduct absent knowledge of the danger. In *Choice*, three students attending

a one-week school ethical leadership program drowned when they surreptitiously left their dormitory to ride paddleboats on the nearby Fox River. *Id*. ¶ 1. Defendant's argument based on *Choice* fails for several reasons. First, *Choice* is inapposite because its discussion of the knowledge the defendant must be alleged to have possessed to state a cause of action for wilful and wanton conduct was based exclusively on the standard as applied to cases involving misconduct by students where a teacher was alleged to have left students unsupervised. See *Choice*, 2012 IL App (1st) 102877, ¶ 72 ("Applying this standard to cases involving misconduct by students, Illinois courts have held that a teacher's mere act of leaving students unsupervised, without more, is not sufficient to establish wilful and wanton conduct."). "[I]n the cases where Illinois courts have found a triable issue of material fact with respect to wilful and wanton misconduct premised upon a lack of proper supervision, it has been because plaintiffs have alleged that defendants knew or should have known of a specific, foreseeable, and probable danger arising from their lack of supervision." *Id*. ¶ 77.

¶ 83    More importantly, in *Choice*, the court recognized that wilful and wanton conduct is a course of action which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others. *Choice*, 2012 IL App (1st) 102877, ¶ 71. Our supreme court has explained that wilful and wanton conduct "requires a conscious choice of a course of action, *either* with knowledge of the serious danger to others involved in it *or* with knowledge of facts which would disclose this danger to any reasonable man." (Emphases added.) (Internal quotation marks omitted.) *Choice*, 2012 IL App (1st) 102877, ¶ 71 (quoting *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 449 (1992)). Thus, immunity will be denied where a party makes a conscious choice of a course of action with knowledge of facts which would alert a reasonable person to a danger to the safety of others from that course of action.

¶ 84    Defendant's argument about "knowledge of the danger" in their reply implies that absent knowledge of Joseph's ingestion of drugs, the paramedics' conduct did not show an utter indifference to or conscious disregard of Joseph's safety. The jury heard evidence to the contrary. In this case, the jury heard evidence that the paramedics knew facts that would have given a reasonable paramedic knowledge of the danger to Joseph's safety from the paramedics' chosen course of action to (in their estimation) visually assess Joseph then leave without asking any questions beyond "Are you okay?" The evidence does not so overwhelmingly favor defendant that the verdict could never stand. Although reasonable minds may differ as to whether the paramedics showed an utter disregard for Joseph's safety when there is no dispute that an emergency response was requested for a child who was not breathing but when paramedics arrived, he was sitting up and able to speak, "[t]he standard for entry of judgment *n.o.v.* is a high one and is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. [Citation.]" (Internal quotation marks omitted.) *Lawlor*, 2012 IL 112530, ¶ 37. Defendant has failed to reach this high burden. The trial court's denial of defendant's motion for judgment *n.o.v.* is affirmed.

¶ 85                                    4. Damages

¶ 86    Finally, we deny defendant's request to remand for a new trial on the issue of damages and request for a remittitur on the grounds the damages award is not supported by the evidence.

The jury awarded damages totaling $5,187,500 for (1) loss of money, goods and services ($1,556,250), (2) loss of society ($2,593,750), (3) Joseph's loss of a normal life ($778,125), and (4) Joseph's pain and suffering ($259,375). Defendant argues that for three of the damages categories, given the evidence presented at trial, the award bears no relationship to the loss suffered. Specifically, defendant argues that plaintiff presented no evidence regarding any pain and suffering Joseph experienced. Plaintiff responds its expert's testimony as to exactly how a person dies from an opiate overdose is sufficient to support the jury's award for pain and suffering. Defendant argues there is no evidence to support an award of a loss of normal life. Plaintiff argues that the efforts required to attempt to resuscitate Joseph after he was transported to the hospital, and even the brief time he spent in intensive care on life support, provide a sufficient basis for the jury's award for loss of normal life. Finally, defendant argues that plaintiff did not present sufficient evidence to support the jury's award for loss of money, benefits, goods and services because plaintiff did not present evidence of Joseph's likely ability to earn a living. Plaintiff argues that the evidence of Joseph's services to his father in assisting him coach baseball, which Joseph played avidly and well, supports the jury's award for lost value of benefits, goods and services.

> "An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience. [Citation.] *** The measure of damages is a question of fact to be decided by the trier of fact, and a reviewing court should not substitute its judgment for that of the trier of fact. [Citation.] A reviewing court will order a new trial on damages only if the amount awarded bears no reasonable relationship to the loss suffered by plaintiff or is unsupported by the manifest weight of the evidence and the opposite conclusion is clearly evident. [Citation.]" (Internal quotation marks omitted.) *Calloway v. Bovis Lend Lease, Inc.*, 2013 Ill. App (1st) 112746, ¶ 111.

¶ 87    Defendant is not entitled to a remittitur of the jury's damages award for Joseph's pain and suffering. Plaintiff presented evidence of what Joseph experienced as the opiate overdose took effect. Dr. Tan testified that the effect of opiates is to slow breathing, which then becomes "just intermittent gasping. And then, finally, they quit breathing altogether." It was for the jury to determine whether and to what degree Joseph suffered any pain as a result of those experiences. See *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511, 523 (1987) (jury allowed to weigh conflicting testimony to determine whether decedent consciously experienced pain). Evidence to support an award for pain and suffering need not be extensive. *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 663 (2011) ("testimony, while not extensive, *** supported an award of damages for *** loss of a normal life, as well as for her pain and suffering"). Moreover, the case law emphasizes great deference to the jury's award decision. *Hulbert v. York*, 319 Ill. App. 3d 54, 58 (2001). In light of these principles, we cannot say that the jury's award is against the manifest weight of the evidence.

¶ 88    Nor is the jury's damages award for Joseph's loss of a normal life against the manifest weight of the evidence. The trial court instructed the jury that loss of a normal life means "the temporary or permanent diminished ability to enjoy life." Defendant concedes that Joseph

experienced a loss of a normal life between approximately 1:30 a.m. on October 31, 2004, and 5:50 p.m. on November 1, 2004, when he was pronounced dead. The court also instructed the jury that in fixing damages for loss of a normal life the jury was to determine the amount of money that would compensate the estate for the damages proved by the evidence "during the period between the time of the decedent's injuries and the time of his death." There is no dispute that Joseph suffered a loss of a normal life, and we may presume that the jury awarded those damages only for the period during which defendant agrees Joseph suffered a loss of a normal life (*Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 100 (2008) ("In Illinois, the jury is presumed to have followed its instructions.")). Thus, the only question is whether, based on the amount of the award, we may usurp the role of the jury in assessing damages. *Carroll v. Preston Trucking Co.*, 349 Ill. App. 3d 562, 572 (2004) ("[J]urors, when considering damages, use their combined wisdom and experience to reach fair and reasonable judgments. We are neither trained nor equipped to second-guess those judgments about the pain and suffering and familial losses incurred by other human beings. To pretend otherwise would be sheer hubris." (Internal quotation marks omitted.) (quoting *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 1073 (2000))).

¶ 89    "There is no mathematical formula for deciding whether an award is fair and reasonable. Factors that may be considered are: the extent of the injuries suffered and permanency of the plaintiff's condition, the plaintiff's age, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries." *Epping*, 315 Ill. App. 3d at 1072. The jury's award for loss of a normal life was fair and reasonable. During the period Joseph remained alive, his ability to pursue the pleasurable aspects of life was completely erased. Joseph was a young boy with an active lifestyle, friends, and a good relationship with family. He could enjoy none of those things, even if for a brief period in time. "[A] damages award for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury and the judgment of the trial court." (Internal quotation marks omitted.) *Epping*, 315 Ill. App. 3d at 1073. In light of the complete loss of normal life Joseph suffered and the deference we must accord the jury in these matters, we cannot say defendant is entitled to a remittitur or a new trial on this element of damages.

¶ 90    Finally, the trial court instructed the jury that in determining pecuniary loss, the jury could consider what the evidence showed concerning what benefits, goods, and services the decedent customarily contributed in the past and was likely to have contributed in the future. The trial court also instructed the jury regarding the pecuniary loss proved by the evidence as follows:

"Where a decedent leaves lineal next of kin, the law recognizes a presumption that the lineal next of kin have sustained some substantial pecuniary loss by reason of the loss of the child's society. The weight to be given this presumption is for you to decide from the evidence in this case."

¶ 91    The amount awarded does bear a reasonable relationship to the loss suffered.

"[L]ineal kinsmen are presumed, by reason of that relationship alone, to suffer substantial pecuniary loss from the wrongful death of a decedent, and actual loss need not be proved. [Citation.] Thus, parents are presumed to suffer substantial pecuniary

- 25 -

loss from the wrongful death of their minor child. [Citation.] *** The court noted that in cases where the deceased is a minor, pecuniary damages include the parents' reasonable expectation of benefits from the continuation of the child's life in addition to the presumption of substantial loss. The *** court qualified this acknowledgment with the fact that this latter presumption is not conclusive and that courts invoking it have buttressed it with supporting evidence of the decedent's good health, industrious habits, and potential longevity." *Magnone v. Chicago & North Western Transportation Co.*, 126 Ill. App. 3d 170, 179 (1984).

¶ 92 The jury could presume that Joseph's parents would have both benefitted from the continuation of Joseph's life, in addition to having suffered a "substantial" loss from his death. The jury's pecuniary damages award in this case for the loss of a 15-year-old child is not shocking to the judicial conscience, and defendant has not pointed to evidence of passion or prejudice by the jury other than the award itself. Therefore, we will not substitute our judgment for that of the jury as to the value of that loss. *Simmons v. University of Chicago Hospitals & Clinics*, 247 Ill. App. 3d 177, 191 (1993) ("Our supreme court has repeatedly found that the amount of damages to be assessed under the circumstances of any given case is a matter within the discretion of the jury. [Citations.] The jury's assessment of damages will not be set aside on review unless it was the result of passion or prejudice, falls outside the limits of fair and reasonable compensation, or shocks the judicial conscience." (citing *Baird v. Chicago Burlington & Quincy R.R. Co.*, 63 Ill. 2d 463 (1976), and *Lau v. West Towns Bus Co.*, 16 Ill. 2d 442 (1959))).

¶ 93 Defendant's request for remittitur or for a new trial on each of the foregoing elements of damages is, therefore, denied.

¶ 94                                            CONCLUSION
¶ 95 For all of the foregoing reasons, the trial court's judgment is affirmed.

¶ 96 Affirmed.